CAMPBELL ET AL. *v.* UNITED STATES.

No. 53. Argued December 6, 1960.—Decided January 23, 1961.

*Melvin S. Louison* and *Lawrence F. O'Donnell* argued the cause for petitioners. With them on the brief was *Leonard Louison.*

*Roger G. Connor* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Wilkey, Beatrice Rosenberg* and *Kirby W. Patterson.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

After a government witness testifies on direct examination in a federal criminal prosecution the trial court is required, under the so-called Jencks Act,[1] on motion of

---

[1] 18 U. S. C. § 3500. *Demands for production of statements and reports of witnesses.*

"(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which

the defendant, to order the United States to produce, for impeachment purposes, defined pretrial statements of the witness, or parts of such statements as determined under subsection (c), which relate to the subject matter of his trial testimony and are in the possession of the United States. The conviction of the petitioners in the District Court for the District of Massachusetts for bank robbery in violation of 18 U. S. C. § 2113 was sustained by the Court of Appeals for the First Circuit. 269 F. 2d 688. During the trial the court ordered the Government to produce a document described on cross-examination by one of its witnesses in terms which satisfy the definition of a "statement" under the Act. The Government denied having possession of such a document. It did, however,

---

was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

"(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be

admit possession of an Interview Report of an interview by an FBI agent with that witness, but contended that this report fell outside the statute. The trial judge held an inquiry without the jury present, at the conclusion of which he refused to order the United States to deliver the Interview Report to the petitioners, and also denied their motion to strike the testimony of the witness. The procedure at that inquiry raises questions important in the administration of the Jencks Act, and we granted certiorari limited to the review of those questions. 362 U. S. 909.

The government witness was Dominic Staula, a depositor who was in the bank at the time of the robbery. On direct examination he identified the petitioner Lester as

preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

"(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

"(e) The term 'statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement." Added by Pub. L. 85–269, Sept. 2, 1957, 71 Stat. 595.

one of the robbers. When asked on cross-examination whether he made any statements to government agents before the trial, he said that an agent of the Federal Bureau of Investigation who interviewed him during the week following the robbery wrote down such a statement. His recollection of what occurred at the interview was not entirely clear,[2] but the trial judge ruled that he had made a statement satisfying the requirements of the Jencks Act and ordered the United States to produce it. The Assist-

---

[2] The pertinent parts of his testimony are as follows:

"XQ. Now, Mr. Witness, when you said you had a conversation with the FBI some time less than a week after July 18, 1957, did they write down what you had to say to them?

"The COURT: If you know.

"The WITNESS: Yes.

"XQ. And did they read it back to you, sir? A. Yes.

"XQ. And did they ask you if that was essentially what you had just related to them? A. Yes.

"XQ. And did you tell them yes? A. Yes.

.        .        .        .        .

"The COURT: I will order it produced. There is a foundation laid for it.

.        .        .        .        .

"The WITNESS: . . . He didn't actually ask me questions. I mean, at first I told him the story, and then when I got through he asked me a few questions.

"The COURT: Well, did he read it back to you?

"The WITNESS: I believe he did.

"The COURT: What is your best memory of it?

"The WITNESS: I am pretty sure he did.

"The COURT: Is your memory such as to enable you to say that what was read back to you was an accurate statement of what you told him?

"The WITNESS: Yes.

.        .        .        .        .

"The WITNESS: If you will excuse me, I am trying to rack my brain to think about what happened. I think they wrote down what I said, and then I think they gave it back to me to read over, to make sure that it was right. And I think I had to sign it. Now, I am not sure. I couldn't remember before—"

ant United States Attorney presenting the Government's case stated that he had no such paper as the witness described. He stated further that the only document in the possession of the prosecution was not a "statement" within the statute, but a typed Interview Report [3] of FBI Special Agent Toomey prepared and transcribed after the interview at a time unknown to the Assistant. The Assistant refused to deliver the report to petitioners' counsel but delivered it to the judge for his inspec-

---

[3] The District Court sealed the Interview Report for the Court of Appeals. The Court of Appeals released it and it is in the record here. The full text is as follows:

"Federal Bureau of Investigation Interview Report

"Mr. Dominic Staula, home address 259 Island Street, Stoughton, Massachusetts, a customer at the victim bank, advised that he arrived at the Norfolk County Trust Company in Canton, Massachusetts, to transact some business at approximately 10:15 A. M., July 18, 1957. Mr. Staula stated that he was driving a truck and parked it beside the Canton Depot in the parking area located between the railroad depot and the bank. He stated that he noted nothing unusual when he entered this parking area nor did he notice anything unusual in walking from where he parked his vehicle to the bank.

"It was stated by Mr. Staula that he went to the teller's window which is served by Mr. Kennedy and while standing in line at this window, but before being waited upon by Mr. Kennedy, he heard somebody state from behind him 'Over against the wall.'

"Mr. Staula stated that he looked around and observed a man whom he described as being a negro, wearing gray chino pants, standing in the center of the lobby and holding a gun. Staula stated that he immediately realized that the bank was being held up and at once took his deposits which consisted of cash and slid them into his side trouser pocket.

"Mr. Staula went on to state that he only observed the man standing in the center of the lobby for an instant and could give no further description of him because he turned toward the front of the bank and observed another man standing there holding a gun. Staula stated that he looked at this man for a short period of time and described him as follows: [*Footnote 3 continued on p. 91.*]

tion. To the court's question whether the Government possessed "any statement that was copied by an FBI Agent which in any way would reflect a statement that this witness made and which he substantially adopted

---

"Property of FBI.—This report is loaned to you by the FBI, and neither it nor its contents are to be distributed outside the agency to which loaned.

Sex ........................ Male.
Race ....................... Negro.
Age ........................ Approximately 30 years.
Height ..................... 5′ 10″.
Weight ..................... 165 pounds.
Complexion ................. Very dark.
Build ...................... Slender.
Face ....................... Round.
Clothing ................... Dark blue suit.
                             Blue snap brim hat.
                             White shirt.

"Mr. Staula stated that he did not observe a third man in the bank—

"It was stated by Mr. Staula that he did not know what type of gun was carried by these two individuals whom he observed but believed that they could have been 45 caliber automatics.

"Mr. Staula stated that after taking a look at the individual wearing the blue suit he faced the wall as previously ordered and observed these individuals no further.

"He stated that after he stood with his face to the wall for approximately 10 minutes one of the robbers ordered him and the other people who were standing on either side of him to walk into the vault. He stated that he does not recall which of the robbers issued this order but that he did enter the vault as directed and observed these individuals no further.

"Mr. Staula stated that one of the robbers, closed the door of the vault he issued some order to the effect that the people locked inside should not leave and that they stayed there for 5 or 10 minutes until the vault door was opened by Sergeant Ruane of the Canton, Massachusetts, Police Department."

"Interview with Dominic Staula, File # 91–952, on July 19, 1957, at Canton, Massachusetts, by Special Agent John F. Toomey, Jr., bjp."

as the statement," the Assistant replied "No, your Honor, we don't." To the further question whether "the United States [has] in its possession any notes that were taken down by the FBI Agent at the time this witness was interviewed," the Assistant answered, "I do not have them in my possession and I do not know whether they ever existed."

The Jencks Act limits access by defendants to such government papers as fit the Act's definition of "statements" which relate to the subject matter as to which the witness has testified, *Palermo* v. *United States*, 360 U. S. 343. However, the statute requires that the judge *shall,* on motion of the defendant, after a witness called by the United States has testified on direct examination, order the United States, for impeachment purposes, to produce any such "statements." To that extent, as the legislative history makes clear, the Jencks Act "reaffirms" our holding in *Jencks* v. *United States,* 353 U. S. 657, that the defendant on trial in a federal criminal prosecution is entitled, for impeachment purposes, to relevant and competent statements of a government witness in possession of the Government touching the events or activities as to which the witness has testified at the trial. S. Rep. No. 981, 85th Cong., 1st Sess., p. 3. And see H. R. Rep. No. 700, 85th Cong., 1st Sess., pp. 3–4. The command of the statute is thus designed to further the fair and just administration of criminal justice, a goal of which the judiciary is the special guardian.

After an overnight recess the trial judge conducted an inquiry without the jury present to take testimony and hear argument of counsel. Plainly enough this was a proper, even a required, proceeding in the circumstances. Determination of the question whether the Government should be ordered to produce government papers could not be made from a mere inspection of the Interview Report, but only with the help of extrinsic evidence. The

situation was different from that governed by subsection (c), in which the Government admits that a document in its possession is a "statement" but submits the paper for the judge's *in camera* inspection to delete matter which the Government contends does not relate to the subject matter of the testimony of the witness. The situation was similar to that in *Palermo,* where the Government also contended that a paper in its possession was not a "statement." We there approved the procedure of taking extrinsic testimony out of the presence of the jury to assist the judge in reaching his determination whether to order production of the paper. We said, at 354–355, "It is also the function of the trial judge to decide, in light of the circumstances of each case, what, if any, evidence extrinsic to the statement itself may or must be offered to prove the nature of the statement."

In this case the aid of extrinsic evidence was required to answer the following questions bearing on the petitioners' motions:

Did Toomey write down what Staula told him at the interview? If so, did Toomey give Staula the paper "to read over, to make sure that it was right," and did Staula sign it?

Was the Interview Report the paper Staula described, or a copy of that paper? In either case, as the trial judge ruled, the Interview Report would be a producible "statement" under subsection (e) (1). "Statements" under that subsection are not limited to such as the witness has himself set down on paper. They include also a statement written down by another which the witness "signed or otherwise adopted or approved" as a statement "made by said witness." True, the report does not bear Staula's signature and the witness testified "I think I had to sign" the original paper. However, if the paper was otherwise adopted or approved by the witness,

his signature was not essential. See *Bergman* v. *United States,* 253 F. 2d 933, 935, note 1; *United States* v. *Tomaiolo,* 280 F. 2d 411, 413.

If the Interview Report was not the original or a copy of the paper Staula described, what became of the paper?

In any event, even if the Interview Report was not the original or a copy of the paper Staula described, had Staula read over and approved the Interview Report? In such case the report would be producible under subsection (e)(1) although not related to the paper Staula described. Or was the Interview Report a substantially verbatim recital of an oral statement which the agent had recorded contemporaneously? If extrinsic evidence established this, the report would be producible under subsection (e)(2). *Palermo* v. *United States,* at 351–352.

The obvious witness to call was Special Agent Toomey who, the parties agreed, was readily available. Defense counsel suggested that the agent be called "to explain where he got the . . . [Interview Report]," and also because "Mr. Toomey could easily say what he has done with the original writing." Defense counsel were not in a position also to appreciate the significance of Toomey's testimony to the possible producibility of the Interview Report itself. Consistent with our admonition in *Palermo,* 360 U. S., at 354, that "It would indeed defeat this design [to limit defense access to government papers] to hold that the defense may see statements in order to argue whether it should be allowed to see them," neither the Government nor the judge permitted them to inspect it. From his own inspection, however, the judge was aware of the significance which Toomey's evidence might have on the judge's determination whether he should order the Government to turn over the Interview Report to the

defense. The Interview Report resembles the statement Staula described and the judge indicated that he would order its production if it was that statement or a copy of it, or although not the original or a copy, if Staula had read and approved it, or if it was a contemporaneously recorded substantially verbatim recital of Staula's oral statement. Nevertheless, the judge ruled that it was for the petitioners to subpoena Toomey as "their witness" if they believed his testimony would support their motions, and that he would not of his own motion summon Toomey to testify, or require the Government to produce him. We think that this ruling was erroneous.

The inquiry being conducted by the judge was not an adversary proceeding in the nature of a trial controlled by rules governing the allocation between the parties of the burdens of proof or persuasion. The inquiry was simply a proceeding necessary to aid the judge to discharge the responsibility laid upon him to enforce the statute. The function of prosecution and defense at the inquiry was not so much a function of their adversary positions in the trial proper, as it was a function of their duty to come forward with relevant evidence which might assist the judge in the making of his determination. These considerations standing alone suggest that the emphasis on the petitioners' burden to produce the evidence was misplaced. The statute says nothing of burdens of producing evidence. Rather it implies the duty in the trial judge affirmatively to administer the statute in such way as can best secure relevant and available evidence necessary to decide between the directly opposed interests protected by the statute—the interest of the Government in safeguarding government papers from disclosure, and the interest of the accused in having the Government produce "statements" which the statute requires to be produced.

The circumstances of this case clearly required that the judge call Toomey of his own motion or require the Government to produce him. Not only did the Government have the advantage over the defense of knowing the contents of the Interview Report but it also had the advantage of having Toomey in its employ and presumably knew, or could readily ascertain from him, the facts about the interview. In addition to the consideration that the interest of the United States in a criminal prosecution ". . . is not that it shall win a case, but that justice shall be done, . . ." *Berger* v. *United States,* 295 U. S. 78, 88, the ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary. *United States* v. *New York, N. H. & H. R. Co.,* 355 U. S. 253, 256, note 5. Moreover, the petitioners' cross-examination of Staula had shown a *prima facie* case of their entitlement to a statement, and, at the least, the judge should have required the Government to come forward with evidence to answer that case. Cf. *United States* v. *Costello,* 145 F. Supp. 892, 894–895, note 13. Since the Interview Report was not, and under *Palermo* could not be, made available to the petitioners, and they thus had no way of knowing the significance of its contents to the question the judge was to determine, it saddled an unfairly severe burden on them to require them to subpoena Toomey as "their witness." In the role of petitioners' witness, they would be groping in the dark in questioning him, and they might be bound by his answers. As a witness called by the Government or even as the court's witness, they would have a latitude in cross-examination to which the circumstances entitled them.

Instead of calling Toomey or having the Government call him, the trial judge fell into further error by relying upon Staula to supply the information he sought. Over the objection of government counsel that the Interview

Report had not been "recorded contemporaneously with the making of such oral statement," and over the objection of the petitioners that "If this man now reads that statement it loses its effect for purposes of impeachment," the judge directed Staula to read the Interview Report and say whether he was familiar with it. The witness said that he had never seen the report. The judge then asked Staula ". . . is that a substantially verbatim recital of what you told Agent Toomey?" The witness replied, "That's not written up just the way the story is." "There are things in there turned around." It was after this testimony was elicited from Staula that the judge ruled he would not order the delivery of the Interview Report to the petitioners, and denied their motion to strike the witness' testimony.

Reliance upon the testimony of the witness based upon his inspection of the controverted document must be improper in almost any circumstances. The very question being determined was whether the defense should have the document for use in cross-examining the witness. Under *Palermo,* the trial judge was not to allow the defense to inspect the Interview Report "in order to argue whether it should be allowed to see" it, since to do so would be inconsistent with the congressional purpose to limit access to government papers. Similarly, Staula should not have been allowed to inspect the Interview Report, since there necessarily inhered in the witness' inspection of the paper the obvious hazard that his self-interest might defeat the statutory design of requiring the Government to produce papers which are "statements" within the statute. For example, the Interview Report states that Staula was unable to give any description of one of the robbers. This is in sharp contrast to his positive identification of Lester made on direct examination. Experienced trial judges and lawyers will readily understand the value of the use of the report on cross-examina-

tion of the witness. But the petitioners were deprived of the opportunity to make use of the report by the obviously self-serving declarations of the witness that it did not accurately record what he told the agent.

Moreover, failure of the judge to call for Toomey's testimony foreclosed a proper determination of the petitioners' motion to strike the witness' testimony. If the Interview Report was not the original or a copy of the paper Staula described, and that paper was destroyed, the petitioners might have been denied a statement to which they were entitled under the statute. Thus, even if the Interview Report itself were producible, a situation might have arisen calling for decision whether subsection (d) of the statute required the striking of the testimony of the witness. The parties argue whether destruction may be regarded as the equivalent of noncompliance with an order to produce under that subsection. The Government contends that only destruction for improper motives or in bad faith should be so regarded. The petitioners contend that destruction without regard to the circumstances should be so regarded. However, this record affords us no opportunity to decide this important question of the construction of subsection (d). We do not yet know that such a paper existed, and was destroyed, or the circumstances of its destruction, nor can we know without the benefit at least of Toomey's testimony.

We conclude that because of these errors in the conduct of the inquiry the petitioners are entitled to a redetermination of their motion for the production of Staula's pretrial statements, and of their motion to strike his testimony. However, we do not think that this Court should vacate their conviction and order a new trial. The petitioners' rights can be fully protected by a remand to the trial court with direction to hold a new inquiry consistent with this opinion. See *United States* v. *Shotwell*

*Mfg. Co.,* 355 U. S. 233. The District Court will supplement the record with new findings and enter a new final judgment of conviction if the court concludes upon the new inquiry to reaffirm its former rulings. This will preserve to the petitioners the right to seek further appellate review on the augmented record. On the other hand, if the court concludes that the Government should have been required to deliver the Interview Report or other statement to the petitioners, or that it should have granted their motion to strike Staula's testimony, the court will vacate the judgment of conviction and accord the petitioners a new trial.

The judgment of the Court of Appeals is therefore vacated and the case is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Frankfurter, whom Mr. Justice Clark, Mr. Justice Harlan and Mr. Justice Whittaker join, dissenting in part and concurring in the result in part.

What is this case? In the course of a prosecution for violation of the Federal Bank Robbery Act, 18 U. S. C. § 2113, Dominic Staula, a government witness, identified defendant Lester as one of three men whom he had observed committing the alleged offense. Upon cross-examination, he disclosed that, on one occasion at local police headquarters, he had been interviewed by at least two FBI agents. He stated that he did not sign any statements, but only signed "a piece of paper saying I was in the bank." On the basis of this testimony the defense requested "the statement of this man" under the Jencks Act, 18 U. S. C. § 3500, which requires that the court order the Government to produce "any statement . . . of the witness in the possession of the United

States which relates to the subject matter as to which the witness has testified." The trial judge denied this request on the ground that the defense had "laid no foundation for it" since "this man said nothing was ever read back to him." No exception was taken to this ruling. In the continuing cross-examination that followed, Staula changed his testimony by recalling that the agents had written down what he had told them, that "it" was read back to him, and that he had told the agents "it" was "essentially what [he] . . . had just related to them." The judge then held *sua sponte* that a foundation had been laid for an order to the Government to produce the described document, and ordered the document produced. A colloquy at the bench followed, in the course of which Staula explained to the judge that since his earlier testimony he had recollected what had taken place; that he "believed" or was "pretty sure" that "it" had been read back to him; that what was read back was an accurate statement of what he had told the agents; that he thought they gave "it" back to him to read over and that he had to sign it, although he was not "sure." Government counsel stated at the bench that the only document in their possession was a "summary of the result of the interview" which represented the FBI agent's "interpretation of what happened." The judge then asked whether the Government possessed "any statement that was copied by an FBI Agent which in any way would reflect a statement that this witness made and which he substantially adopted as the statement," to which government counsel replied "No, your Honor, we don't." A moment later the judge again asked, "Has the United States in its possession any notes that were taken down by the FBI Agent at the time this witness was interviewed?" Government counsel answered "I do not have them in my possession and I do not know whether they ever existed." The judge then asked for and received the FBI agent's report referred

to by the United States Attorney, and the case was adjourned for the day.

The following morning during a conference held in the judge's chambers the Government again asserted that the agent's report was not a copy of the original notes, and that the notes were no longer in existence. A long discussion ensued concerning the producibility of the agent's report. Defense counsel suggested that the FBI agent (Toomey) be called into chambers "to explain where he got the document," and to "say what he has done with the original writing." This the judge denied, but suggested that the defendants were free to subpoena the agent, or, more simply, could ask the Government to have the agent made available for examination. The judge then proposed to ask Staula, out of the presence of the jury, whether the report was a substantially verbatim recital of what he had told the agent, and, if the answer were affirmative, the report would be given to defendants for impeachment purposes. Both sides opposed this move. The Government argued that in any event the report had not been "recorded contemporaneously with the making of such oral statement," and defendants' counsel objected because the impeachment value of the report would be negated by having the witness see the document and himself decide whether it conformed to what he had told the FBI. But Staula was shown the document. He denied that it was a "substantially verbatim recital of what [he] . . . told Agent Toomey," and the judge thereupon denied the defense access to the document for purposes of impeachment. Thereupon defendants moved that, in accordance with the Act, Staula's entire testimony be stricken because the Government had failed to produce "the original document." This motion was denied.

The case presents two entirely separate questions under the Jencks Act, and they should be kept apart. First, what

are the procedural requirements, under the Jencks statute, when counsel for the United States announces that he cannot produce documents for which a foundation has been laid because he does not possess them and does not know of their existence? Secondly, was the FBI agent's available report producible under the Act?

I.

Title 18 U. S. C. § 3500 requires the trial judge, upon a motion by the defendant, to "order the United States to produce any statement . . . of the witness in the possession of the United States" which is relevant to the direct testimony of the government witness. Nothing in the legislative history of the Act remotely suggests that Congress' intent was to require the Government, with penalizing consequences, to preserve all records and notes taken during the countless interviews that are connected with criminal investigation by the various branches of the Government. The legislation narrowed the application of our decision in *Jencks* v. *United States*, 353 U. S. 657, as construed by some of the lower courts, partly by having the relevancy of the material determined by the district judge prior to its production. S. Rep. No. 981, 85th Cong., 1st Sess., p. 2.

Petitioners' contention that the words "in the possession of" must be interpreted as meaning "possession at any prior or present time" must be rejected. Congress surely did not intend to initiate a game of chance whereby the admission of a witness' testimony is made to depend upon a file clerk's accuracy or care. Senator O'Mahoney, the sponsor of the bill, in illustrating that his measure approved the essential basis of the *Jencks* case, interpreted *Jencks* to apply only where the Government "had at the same time in its files a statement" pertinent to a witness' testimony. 103 Cong. Rec. 10120. See also S. Rep. No.

981, 85th Cong., 1st Sess., p. 5; H. R. Rep. No. 700, 85th Cong., 1st Sess., p. 5.[1]

Here government counsel told the court that he did not possess and did not know the whereabouts of the documents which Staula had described. The Court today holds that it fell upon the district judge to conduct a further investigation as to the disposition of the documents, whereby it becomes his duty to call and question the FBI agent who signed the subsequent summary. Defendants did not question the truth or accuracy of the responses of the United States Attorney as to the non-existence of the original notes. Defendants were represented by two competent lawyers who were alert to protect their clients' interest through all available trial procedures and tactics. It surely is not the duty of a district judge to investigate a response by one who is an officer of the court as well as of the United States on the assumption that he has intentionally or irresponsibly violated his responsibility to the court and the Government in conducting the Government's case in a manner consistent with basic legal ethics and professional care.

How does the court's duty regarding a claim by defense under the Jencks statute differ from any other claim for the production of a document? We are told that because Agent Toomey was readily available, it devolved on the judge instead of on the defendants to seek whatever light could be thrown on the matter. Is it now the duty of the district judge to do all that a competent defense counsel would do, or would choose, as a matter of trial judgment, not to do? The procedure now suggested places the judge in the position of a voluntary defender for defendants

---

[1] The Court's opinion implies that the defendant is entitled to statements which the Government does not now possess, *ante*, p. 98. The Act plainly speaks only to a "statement . . . of the witness in the possession of the United States."

already adequately represented. This seems only the more questionable since it may well be that counsel here were satisfied that the documents had been disposed of in a bona fide manner. It is not the duty of this Court to invent hypothetical situations in which independent action by the district judge might have revealed unexpected facts. There was no suggestion, not a hint—either before the trial court, or below, or upon argument here—that the Government's representation of the nonexistence of the documents was not bona fide, was a piece of chicane and as such a fraud upon the court bringing into action the court's protection of its dignity and honor, or a manifestation of professional inadequacy as to call for the court's safeguarding action.

## II.

The other issue presented by the case is the producibility of the FBI agent's report which had been put into possession of the court. Subsection (e) of the Jencks Act thus defines the papers in the Government's possession that are subject to production:

> "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

> "(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

The plain differentiation between the two clauses is that the former relates to statements written by a witness, while the latter encompasses his oral statements recorded and transcribed by another. As to the statements that

the witness had himself set down on paper, Congress desired that his signature or some other form of approval be shown to assure authenticity. The required approval would also quiet any doubts that the witness had an adequate opportunity to scrutinize for verification the document which he had prepared. These are appropriate safeguards for the use of these documents as a basis for impeaching the witness' testimony on the stand. As to oral statements, the statute prescribes that their content be "a substantially verbatim recital" of the witness' words, recorded contemporaneously. "Clearly this provision allows the production of mechanical or stenographic recordings of oral statements, even though later transcribed." *Palermo* v. *United States,* 360 U. S. 343, 351–352. Producibility, for purpose of impeachment, of a statement drawn up in the third person by an agent requires that the whole oral statement be contemporaneously recorded. Under this standard, a summarization by an agent of selective portions of testimony by the witness would not fall within the scope of the Act. "[B]eyond mechanical or stenographic statements . . . a very restrictive standard is to be applied" in defining what is a "statement" under the statutory language. *Palermo* v. *United States, supra,* at 360. Under subsection (2), it makes no difference whether these agent summaries are signed or approved by the witness; "the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital." *Palermo* v. *United States, supra,* at 352. As the bill originally came out of the House Judiciary Committee, 103 Cong. Rec. 16125, such summaries when approved by the witness would have been subject to production. H. R. Rep. No. 700, 85th Cong., 1st Sess., p. 6. However, the subsequent revision of the bill as finally enacted makes

clear that those statements of a witness given orally to the Government must meet the standard of "substantially verbatim" in order to be produced for purposes of impeachment.[2] See Appendix B, *Palermo* v. *United States, supra,* at 358–360.

In *Palermo,* we approved of the district judge's holding proceedings *in camera* to determine whether questionable documents constituted statutory "statements." 360 U. S., at 354. It needed no explicitness to establish that the "substantially verbatim" test was to be made by extrinsic proof, not by asking the witness himself whether the document in question substantially conformed to what he had told the federal agents. We agree with the Court that the procedure in which the trial judge indulged was erroneous. The witness might deny the accuracy of the document in order to avoid impeachment; even if produced, the document loses much of its potentiality for impeachment if the witness has already examined its contents.

But the trial judge's error in submitting, out of hearing of the jury, the Interview Report for Staula's determination of its accuracy would not warrant reversal if that report proves itself, on its face, not to be a statutory "statement." In *Palermo,* the document was a 600-word summary of a 3½-hour conference, which we held was clearly not a virtually verbatim transcript. 360 U. S., at 355, n. 12. The Interview Report here comes to slightly over 500 words. But the record is silent as to the duration of the interview. Nor does it disclose

---

[2] Insofar as the Court's opinion suggests that, had Staula signed the Interview Report, it would conclusively have been producible, we disagree. Under the statutory language, it still would have been necessary to find that the report was "a substantially verbatim recital" of that which Staula told the agents. Section 3500 (e) (1) is inapplicable.

whether the interview was contemporaneously recorded,[3] or how any such recording was transcribed. However doubtful it may seem, it may be the fact that the interview was very brief, not more than a few minutes, and that the conversation as an entirety was faithfully recorded and constituted an accurate account of all that transpired.

It is the responsibility of counsel for defendants, as has been elucidated, to pursue ascertainment of the correctness of the Government's claim that documents which are demandable for production under the Jencks Act are no longer in existence, and for no reprehensible reason chargeable to the Government. That is an issue like any other issue of appropriate evidentiary demand. It is not for the court to question that the foundation for production—here, the existence of a document—is wanting, if counsel for defendants do not question the Government's explanation for non-production. A very different issue is presented in determining the legal significance of a document like the FBI report under the Jencks Act, which is produced for the confidential inspection of the court and not shown to the defense. Here the responsibility for resolving the issue rests with the court, and it is the court that must pursue appropriate means for ascertaining the facts relevant to judgment.

The district judge should and easily could have probed these matters, vital to ascertainment of the Jencks Act

---

[3] Aside from Staula's conflicting testimony that the agent took notes.

During the proceedings in chambers, the Government repeatedly asserted that the report was not in existence at the time Staula was interviewed. Assuming this to be true, it is irrelevant; the question is whether there was a contemporaneous recording from which the transcription was later made. See *Palermo* v. *United States, supra,* at 351–352.

quality of the report, by interrogating counsel, or, as the Court suggests, examining Agent Toomey on the circumstances of the interview.[4]   Since on this record we cannot say that the report was patently not producible under the Act, we have no recourse but to remand the matter to the District Court for determination whether the report meets the requirements of subsection (e)(2).

---

[4] Calling Agent Toomey for this purpose is a very different thing from requiring the judge to call him in order to controvert the Government's assertion that no other notes or documents were in their possession.  That was for the defense to deal with.