346 F.2d 10
 Raymond DENNIS, Appellant,
v.
UNITED STATES of America, Appellee.
Irving DICHTER, Appellant,
v.
UNITED STATES of America, Appellee.
Harold SANDERSON, Appellant,
v.
UNITED STATES of America, Appellee.
Albert SKINNER, Appellant,
v.
UNITED STATES of America, Appellee.
Maurice E. TRAVIS, Appellant,
v.
UNITED STATES of America, Appellee.
Charles H. WILSON, Appellant,
v.
UNITED STATES of America, Appellant.
 Nos. 7621-7626.
 United States Court of Appeals Tenth Circuit.
 April 26, 1965, Rehearing Denied June 28, 1965.
 
 Telford Taylor and Nathan Witt, New York City (George J. Francis, Denver, Colo., on brief), for appellants.
 Donald P. MacDonald, Denver, Colo. (J. Walter Yeagley, Washington, D.C., Lawrence M. Henry, Denver, Colo., and George B. Searls, Washington, D.C., on brief), for appellee.
 Before MURRAH, Chief Judge, and PICKETT and HILL, Circuit Judges.
 MURRAH, Chief Judge.
 
 
 1
 Appellants appeal from a judgment of conviction on retrial after reversal of convictions on prior trial. See Dennis v. United States, 10 Cir., 302F.2d 5.
 
 
 2
 On the prior appeal we sustained the validity of the indictment and the Court's denial of all pre-trial motions. We reversed the case for admission of hearsay testimony, but sustained the sufficiency of admissible testimony to support the verdict of the jury as to all of the appellants except Durkin and Powers. As to them, we held the evidence insufficient to support conviction.
 
 
 3
 This appeal perpetuates the attack on the indictment, the constitutionality of 9(h) of the National Labor Relations Act, and the bar of the Statute of Limitations, but these points are not argued. The appellants do sharply challenge the sufficiency of the evidence on retrial to establish a conspiracy to violate 9(h), but argue if a conspiracy is established, it is at variance with the one charged in the indictment. The contention is that the evidence on retrial is decisively different because some of the witnesses who testified in the former trial did not testify in this trial, and some who did gave materially different testimony. Several trial errors relating to the admission of evidence and instructions to the jury are reassigned in different trial context.
 
 
 4
 On the sufficiency of the evidence in this appeal to prove the alleged conspiracy the Government adheres to its original theory to the effect that before and after the enactment of 9(h) the Communist Party was opposed to its non-communist affidavit provisions; that the appellants were at once members of the Communist Party subject to its discipline and officers or functionaries in the 'Mine Mill' Union; that the Communist Party dictated the Union's opposition and consequent refusal to comply with the provisions of 9(h); that in the Summer of 1949 the Communist Party changed its policy to comply with the provisions of the Act, and the Union, acting through the appellants as its officers, obediently changed its policy to one of compliance; and that pursuant to this changed policy, some of the appellants filed false non-communist affidavits with the knowledge and guilty intent of all.
 
 
 5
 It does not been to be disputed that during all or part of the time laid in the indictment, all the appellants were members of the Communist Party and also officers or staff members of 'Mine Mill';[1] that the Communist Party and the Union both opposed compliance with 9(h), and at first the Union refused to comply. That thereafter the Communist Party changed its policy to advocate compliance with the Act, and the Union, acting through the appellant-directors, complied with the Act by filing non-communist affidavits, some of which were false. But, the appellants earnestly contend that this parallelism of policy and identity of membership falls far short of proving a conspiracy among the appellants to defraud the Government by filing false non-communist affidavits to effectuate Union compliance with 9(h). We are reminded that the gist of the offense charged is the unlawful agreement which is not proved by the factum of filing false affidavits by one or more of the appellants. See United States v. Borelli, 2 Cir., 336 F.2d 376, 384.
 
 
 6
 The Government pins its case of unlawful agreement on the prolonged association of the appellants as members of the Party and officers of the Union, dedicated to a common cause, i.e. compliance with 9(h), by the conscious filing of false noncommunist affidavits.
 
 
 7
 In the former appeal we were of the view that quite apart from the excluded testimony, the statements made by appellants Travis and Wilson relative to a change in the Party policy; the record proof that appellants as Party Members subjected themselves to Party discipline; the evidence that a 'Steering Committee', 'of which some of the appellants were members' transmitted the 'Communist Party program, decisions, to the Union * * *' for implementation; appellants' common knowledge of the problems presented by the Taft-Hartley Act; and the common bonds existing between appellants as members of the Communist Party and as officers and employees of 'Mine Mill', authorized the jury's findings that the alleged conspiracy laid in the indictment was consummated, i.e. See Dennis v. United States, supra, 302 F.2d p. 10.
 
 
 8
 We then proceeded to analyze the evidence to determine its sufficiency to justify the jury's findings of conscious participation on the part of the individual appellants. In doing so we observed the well known and salutary rule that 'mere knowledge, approval or acquiescence in the object or purpose of a conspiracy does not make one a conspirator'. Id. p. 12. We thought that while the evidence was unquestionably sufficient to show that Durkin and Powers were active members of the Communist Party, it was insufficient to connect them with the conspiracy. We reversed the case as to them with directions to grant the motion for acquittal.
 
 
 9
 After reviewing the record in some detail, we thought the evidence sufficiently connected Dichter, Sanderson and VanCamp with the conspiracy to justify the jury's verdict. VanCamp was acquitted on retrial.
 
 
 10
 Without tediously analyzing the proof relating directly to the appellants Dennis, Skinner, Travis and Wilson, we were of the view that their 'individual acts and declarations were forcefully demonstrative of their culpable association in the conspiracy.' (Former appeal, 302 F.2d p. 13)
 
 
 11
 If the evidence was sufficient to convict on the former appeal, the same evidence is, of course sufficient now, and the only question of sufficiency then is whether, as appellants contend, it was materially different and decisively less convincing.
 
 
 12
 Witness Mason died before retrial, and his testimony (Former appeal, 302 F.2d p. 9) concerning appellant Travis was perpetuated under the rule of Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409; West v. State of Louisiana, 194 U.S. 258, 24 S.Ct. 650, 48 L.Ed. 965.
 
 
 13
 As to appellant Wilson, it is argued that testimony in this trial tending to connect him with the conspiracy is materially different from the former. Specifically, witness Fikes' testimony in the former trial concerning Wilson's incriminatory statements (made at a meeting in Bessemer, Alabama, in the Summer of 1949) to the effect that the letters of resignation from the Communist Party 'wouldn't mean anything and would be phoney' was not repeated on retrial. Instead, Fikes and Lawrence (a member of the Communist Party who attended the Bessember meeting but did not testify in the first trial) testified concerning the meeting that Wilson was opposed to policy change, and they gave no testimony concerning any statement by him that the resignations from the Party would not be genuine. Witness Lawrence is represented as quoting Wilson to the effect that 'none of the Executive Officers could have any connection with the Party, that is, they could not attend meetings, meet with the Party officials or make contributions directly to the Party.' The testimony of these witnesses was literally different, but the import of the language used was the same. It was susceptible to the inference that Wilson knew of and consented to the change in Party policy and actively participated in the effectuation of it as a Union officer.[2]
 
 
 14
 At the time of the Bessemer meeting in the Summer of 1949, Travis and Wilson were officers of the Union. Travis was Secretary-Treasurer and Wilson was a member of the Board. In accordance with the understanding at the meeting, Travis soon thereafter publicly announced his resignation from the Party in adherence to clearly articulated Party-Union policy. (See Mason's testimony, Former appeal, 302 F.2d p. 9)Appellants suggest that the Government's case against each of the appellants is made up of uncorroborated statements of witnesses concerning incriminating statements by the appellants or by others in their presence, and these statements or admissions are wholly inadequate as a matter of law to prove the offense charged.
 
 
 15
 Uncorroborated statements or admissions are insufficient to prove guilt. See Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101; Yarbrough v. United States, 10 Cir., 309 F.2d 936; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; Annotation 45 A.L.R.2d 1317; Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790. But, incriminating statements made by one co-conspirator during the pendency and in furtherance of a conspiracy are admissible as an exception to the hearsay rule once a conspiracy has been shown.[3] See Wong Sun v. United States, supra, citing Development in the Law-- Criminal Conspiracy, 72 Harv.L.R. 922, 989, 990; Fiswick v. United States, 329 U.S. 211, 67 S.Ct. 224, 91 L.Ed. 196; Krulewitch v. United States, supra; Gay v. United States, 10 Cir., 322 F.2d 208; and Cleaver v. United States, 10 Cir., 238 F.2d 766; Briggs v. United States, 10 Cir., 176 F.2d 317.[4] This practice has often been criticized (See Justice Jackson specially concurring in Krulewitch, supra, 336 U.S., p. 445, 69 S.Ct. p. 719), but has never been rejected. See Developments in the Law-- Criminal Conspiracy, supra; Carbo v. United States, 9 Cir., 314 F.2d 718, 735, cert. denied 377 U.S. 953, 1010, 84 S.Ct. 1626, 1903, 12 L.Ed.2d 498, 1058; United States v. Dennis, 2 Cir., 183 F.2d 201, 230.
 
 
 16
 True, the Government's case here primarily consists of the testimony of eight witnesses who gave evidence of numerous meetings and conferences at different times and places during the period of the alleged conspiracy at which one or more of the appellants participated. This testimony was admitted in evidence under conventional cautionary instructions to the effect that the statements were not binding on any of the appellants not present when made. These instructions were given repeatedly upon suggestion of defense counsel. At the conclusion of the Government's case, the jury was instructed, 'If it now appear from the evidence to your satisfaction beyond a reasonable doubt that a conspiracy existed and that a defendant was one of the members, then the acts knowingly done and the statements knowingly made after the formation of such conspiracy by any person likewise found to be a member may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the acts and statements may have occurred in the absence and without the knowledge of the defendant, provided such acts and statements were knowingly done and made during the continuance of such conspiracy.'
 
 
 17
 Compliance with the rule against the admission of hearsay until a conspiracy has been shown by some independent evidence has been observed by according the trial judge wide latitude in the procedural order of proof. See briggs v. United States, supra. The only protection accorded the absent defendant to be charged with the testimony is the conventional cautionary instruction which the trial court freely used in this case. This practice has also been criticized as 'unmitigated fiction', see Justice Jackson specially concurring in Krulewitch v. United States, supra, but it has been traditionally accepted as the only available method of proof for getting at surreptitiously conceived unlawful agreements.[5]
 
 
 18
 Appellants say that the trial court erroneously departed from his limiting instructions in the general instructions to the jury, but we do not think so. The jury was told they must first determine the existence of the conspiracy charged, and if they entertained a reasonable doubt of the conspiracy as charged, their task was at an end, and they should acquit all defendants. But, if on the other hand, they were convinced beyond a reasonable doubt of the existence of a conspiracy, they should then proceed to consider which, if any, of the appellants were members of it. And, they should determine the participation of any defendant in the conspiracy from the evidence relating to his own acts, declarations and conduct with the actions and conduct of others; that guilt was personal and individual, but once a conspiracy was formed each member became the agent of the other in all things done or said in the promotion or furtherance of the unlawful purpose; however, declarations made not in furtherance of it were not binding on any other members.
 
 
 19
 The jury was told that mere membership in the Communist Party or affiliation with it or the filing of non-communist affidavits with the National Labor Relations Board was not in itself sufficient to show that any particular defendant was in fact a member of the conspiracy. Theses instructions clearly and succinctly stated the law of the case and were entirely consistent with the trial court's cautionary instructions.
 
 
 20
 In the former appeal we approved the procedure by which hearsay statements of alleged co-conspirators may be received as evidence after some evidence aliunde from which the jury could find the existence of a conspiracy and the speaker's complicity in it. See Former appeal, 302 F.2d p. 10 and Briggs v. United States, supra. Indulging in this concept of trial procedure and order of proof, we were of the view that the evidence taken together was factually sufficient to support the alleged conspiracy. The evidence in this appeal is not materially different.
 
 
 21
 Appellants complain of the exclusion of business records to prove alibi and discredit prosecution testimony. Specifically, they complain of the refusal of the trial court to admit the expense vouchers of Dichter to show that he was not in Cleveland all the time to which witness Locke testified. (Former appeal, 302 F.2d p. 11).
 
 
 22
 Locke's expense vouchers were admitted to impeach his testimony to the effect that Travis fired Eckert on April 8, and Dichter took over the office management in Cleveland. Locke's vouchers showed that Eckert continued to approve his expense vouchers until about the middle of May. Later the defense offered Dichter's expense vouchers for the months of April and May, apparently not as a part of cross-examination of Locke, but to impeach his testimony that Dichter took over management of the officer for the next 'month or two' and that he 'had meetings nearly every morning for a while'. When the exhibits were offered, Government counsel stated that he understood the purpose of the vouchers was to show 'where (Dichter) wasn't at a particular time'. Counsel agreed. On this premise the Government objected. The matter was then passed until recess when the offer was renewed 'to controvert the testimony of the prosecution witness, Ralph Locke * * * about what was going on in Cleveland beginning around April 8 or 9, 1948.'
 
 
 23
 The Court sustained the objection to the offer of proof without stating any grounds. No point was made of the authenticity of the vouchers or that they were not a part of the business records of the Union within the meaning of 28 U.S.C. 1732. And, the vouchers may well have been admitted into evidence to impeach Locke's testimony concerning specific dates, but the dates on which Dichter was in Cleveland was not a point on which Locke's testimony was crucial. Failure to admit the vouchers is not fatal to the Government's case.
 
 
 24
 Appellants also complain of the refusal of the Court to lift the lid of secrecy of the grand jury proceedings. The Court's refusal was based upon lack of showing a 'particularized need'. In the former appeal we sustained the trial court's ruling in view of 'the availability of the transcripts of testimony relating to the same subject matter given by many of the government witnesses before other tribunals and the voluminous statements of such witnesses produced under 18 U.S.C.A. 3500'. (Former appeal, 302 F.2d p. 14.)
 
 
 25
 It is suggested that the availability of other material should not be grounds for denying access to the grand jury proceedings, and we agree. Indeed, it may very well disclose inconsistencies indicating the particularized need. Certainly the trial court ought not decline an 'in camera' suggestion in face of the appearance of inconsistencies which might lead to disclosure of further inconsistencies in grand jury proceedings.
 
 
 26
 Some courts have required judicial inspection of grand jury testimony upon the request of a party against whom a witness has given incriminating testimony. See United States v. Hernandez, 2 Cir., 290 F.2d 86; United States v. Giampa, 2 Cir., 290 F.2d 83. Other courts have required 'in camera' inspection whenever it appears 'that the testimony of an important prosecution witness at trial may be inconsistent with his testimony before the grand jury.' Simmons v. United States, 113 U.S.App.D.C. 369, 308 F.2d 324; Harrell v. United States, 115 U.S.App.D.C. 169, 317 F.2d 580. We have been more reluctant to require 'in camera' inspection in the absence of some indication of inconsistency. Travis v. United States, 10 Cir., 269 F.2d 928, 944; Bary v. United States, 10 Cir., 292 F.2d 53, 56. See also Berry v. United States, 8 Cir., 295 F.2d 192; Herzog v. United States, 9 Cir., 226 F.2d 561.[6] But, we have left no doubt of the inherent power and the inescapable duty of the trial court to lift the lid of secrecy on grand jury proceedings in aid of the search for truth. The court should not hesitate to inspect and to disclose any inconsistencies if it is likely to aid the fair administration of criminal justice through proper cross-examination and impeachment. In determining variances or inconsistencies we should remember that flat contradictions are not the only test of inconsistency. Omissions of fact or even contrast in emphasis or different order of treatment may be relevant to the process of testing credibility of a witness' trial testimony. See Clancy v. United States, 365 U.S. 312, 316, 81 S.Ct. 645, 5 L.Ed.2d 574, quoting Jencks v. United States, 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103.
 
 
 27
 Our affirmance is based primarily on the proposition that inasmuch as the witnesses were thoroughly and competently cross-examined on numerous other relevant judicial and extra-judicial statements without manifest inconsistency, it is safe to assume that the grand jury proceedings would not have disclosed anything of impeaching significance. While it would have been safer to have inspected the grand jury testimony, in these peculiar circumstances we remain unwilling to say the trial court committed reversible error by refusing the 'in camera' inspection.
 
 
 28
 Complaint is also made of the Court's interpretation and application of 18 U.S.C. 3500. This evidentiary statute has been authoritatively interpreted to require full disclosure by the Government to the Court of all questionable documents relating to the subject matter of a witness' testimony. But, 'Final decision as to production must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge * * * subject to * * * limited review of the appellate courts.' See Palermo v. United States, 360 U.S. 343, 353, 79 S.Ct. 1217, 3 L.Ed.2d 1287; Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428; 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501; Clancy v. United States, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574; Bary v. United States, 10 Cir., 292 F.2d 53; Ogden v. United States, 9 Cir., 303 F.2d 724; United States v. Crosby, 2 Cir., 294 F.2d 928. In determining the issue of producibility the trial court may, and sometimes must, resort to extrinsic evidence bearing not only on the nature of the document but the peculiar circumstances in which it was made. The need for and the extent of extrinsic evidence bearing on producibility must be left to the wise discretion of the trial judge. 'This is a problem of the sound and fair administration of a criminal prosecution and its solution must be guided by the need, reflected in so much of our law of evidence, to avoid needless trial of collateral and confusing issues while assuring the utmost fairness to a criminal defendant.' See Palermo v. United States, supra, 360 U.S. 355, 79 S.Ct. 1226; Saunders v. United States, 114 U.S.App.D.C. 345, 316 F.2d 346. The appellate function on review is to examine the perpetuated withheld document and voir dire inquiry, if any, to determine whether full consideration has been given to the issue and finally whether the trial court's determination is clearly erroneous. See Campbell II, supra, 493.
 
 
 29
 Specifically, appellants say that Mason's testimony was rendered inadmissible because of the lack of voir dire in the first trial. The complaint rests on these facts. Several of Mason's statements were delivered to the defense under 3500 for use in the first trial. In response to a question from defense counsel the Government prosecutor stated in effect there were no other 'statements', and defense counsel accepted Government counsel's word. At the second trial, additional material in the form of interview notes, reports and memoranda were submitted to the Court.
 
 
 30
 The appellants insist that they were misled by the 'ambiguous representations' of Government counsel, and relying thereon did not voir dire Mason to the prejudice of their right to full crossexamination; that Mason's record testimony should, therefore, be excluded in the second trial. For whatever reason, there was no voir dire of Mason although he was thoroughly and competently cross-examined based upon numerous statements produced pursuant to interviews with Government agents or counsel.
 
 
 31
 If none of the additional documents submitted at the second trial can be said to be producible 3500 'statements' for purposes of cross-examination of witness Mason, no prejudice can result from Government's failure to submit them to the Court or lack of Mason voir dire with respect to them. Prejudice, if any, must inhere in the nature of the documents withheld not in the fact of withholding. All investigators or attorneys, except one, who interviewed Mason were called by the Government to testify concerning the nature of the particular interview and resulting interview report or memoranda. Cross-examination of these interviewers failed to indicate that voir dire of Mason on the first trial on the subject matter of the interviews or the nature of the resulting reports would have induced production of any of the submitted documents.
 
 
 32
 The trial court made specific findings with respect to each of the Mason interviews. In each instance it found that the report, trial memorandum or outline, as the case may be, was made from the memory of the interviewer, from notes made at the time of the interview but destroyed in good faith after dictation of the report or memorandum, or that the trial outline or memorandum had been composed from several sources of information including recorsds of other trials involving some of the same witnesses and defendants. The Court specifically found that none of the documents in question was ever submitted to Mason for signature or approval. With particular reference to the Crandall 'outline' the Court found that it had been prepared from a transcript of Mason's testimony at the first Travis trial in which present defense counsel had participated. Addressing defense counsel during argument on the matter the Court stated, 'So this outline was prepared in testimony that was elicited in open court in your presence in which you participated and it was in no sense a statement under 18-3500.' The trial court's careful findings with respect to the documents resulting from Mason interviews are not clearly erroneous, and its ruling thereon must be sustained.
 
 
 33
 The only Mason interviewer (Foley) not produced for voir dire interviewed him in 1954 apparently regarding a National Labor Relations Board matter. This interview resulted in an affidavit by Mason which was made available to defense counsel in the former trial and redelivered in the present trial. From interrogation of Government counsel the Court was satisfied the affidavit was the only document relating to the interview of Mason by Foley. In these circumstances the trial court's refusal to recall the interviewing attorney from Washington for voir dire was not error. We conclude that Mason's testimony was not improperly perpetuated.
 
 
 34
 All of the other documents relating to the subject matter of the testimony of all other witnesses delivered to the Court for determination of producibility under 3500 were carefully considered by the Court pursuant to the extensive voir dire examination of both the witnesses and with two exceptions (to be noted) the interviewing Government agents. With respect to each identified document or group of documents the responsible interviewing agent testified that he prepared the report, memorandum or outline either from memory or from fragmentary notes, including 'key words and phrases', or that the memorandum or outline was composed from information obtained from the testimony of witnesses in other similar trials and in no instance were any of the documents submitted to or in any way adopted by the related witness. Some of the interviewers who took notes of the interview testified that the notes were destroyed in good faith after dictation of a memorandum. Each witness also testified that although in some instances the interviewer took notes, they were never submitted for signature or approval nor was he in any way called upon to adopt the notes or any other document made pursuant to the interview.
 
 
 35
 One interviewer testified by affidavit (admitted into the record without objection) that he prepared a memorandum of his interview with witness Gardner from fragmentary and abbreviated notes of the matters discussed, but they in no sense purported to be verbatim remarks of Gardner nor were they ever read to him nor was he called upon to approve or affirm them. The notes were appended to the affidavit for the record.
 
 
 36
 Appellants complain of the failure of the trial court to require the attendance of one interviewing attorney for purposes of voir dire. This Government attorney for the Immigration and Naturalization Service interviewed witness Fikes apparently concerning some matter relating to a deportation hearing. When defense counsel suggested the Court require the interviewing attorney be produced for voir dire, the Court inquired of witness Fikes whether he had made any written statement of any kind to this interviewer. Fikes answered he had not and moreover no questions were asked concerning any of the appellants in this case. There was no further cross-examination of any kind and the trial court rightly declined to produce the witness.
 
 
 37
 Based upon voir dire testimony of all responsible interviewers and related witnesses and an examination of each document or group of documents, the trial court concluded that none of the withheld documents was a statement within the definition of 3500. His conclusions were based upon specific findings to the effect that none of them was ever signed or otherwise adopted or approved by the witness nor was it a 'verbatim recording' of the interview of the witness. Appellants do not now contend that any of the documents were signed or otherwise adopted or approved by the witness within the definition of 3500(e) (1). The contention is to the effect that the trial court simply stopped there and did not proceed to determine whether the documents or any of them were producible under 3500(e)(2) as 'other recording * * * which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement'.
 
 
 38
 We do not think that failure of the trial court to couch its findings in the verbatim language of the statute is any indication of its failure to consider the producibility of the documents as 'verbatim recitals' of the oral statements of the witnesses. Appellants were undoubtedly contending for production under either subsection of 3500, and the trial court's inspection and ruling on each document was undoubtedly based upon producibility under either subsection of the statute. In any event we have examined all of the excluded material certified here under seal for the purpose of determining producibility of any of the documents as contemporaneous 'verbatim recitals' or oral statements of witnesses.
 
 
 39
 Our independent examination shows that the trial court did produce a number of statements without excision. Much excised material was produced. The documents and excisions which were withheld related in the main to members of the Communist Party, many of whom are unrelated and unidentified with this case. Others related to activities of the appellants wholly unrelated to these charges. The withheld documents were couched in the vernacular of 'Informant stated', 'Informant advised' or 'Informant related', but none we have examined can be said to be a verbatim recital within the meaning of 3500(e)(2). We think they were properly withheld.
 
 
 40
 During the course of the trial, the defense moved to strike the testimony of witnesses Lawrence, Fikes, Locke and Gardner in consequence of the destruction of the interview notes after preparation of memoranda based thereon. These motions were inspired by footnote 5 of Campbell II, supra, p. 491, where the Court posed but did not answer the issue whether 'If the notes were producible under the Act, their destruction gives rise to sanctions under subsection (d) or permits secondary evidence of their contents to be produced'. We have no occasion to decide this issue since the question itself presupposes producibility of that which was destroyed. Certainly we should not oder the production of an otherwise non-producible document on the chance its non-existent progenitor might have been producible.[7] While the notes are not available for inspection to determine producibility, examination of the memoranda which are based on the notes affords no basis for surmising that the antecedent notes were verbatim recitals of oral statements of the witnesses. On the contrary they indicate quite clearly to us that the notes were not producible so as to give rise to the question of sanctions under subsection (d). In these circumstances we think the trial court properly denied the motions to strike.
 
 
 41
 Finally, appellants complain of the refusal of the trial court to give their requested cautionary instruction on 'accomplice testimony'. The request is based upon the assumption that the witnesses Fikes, Lawrence, and Gardner, although not co-defendants or co-conspirators, were within the definition of an 'accomplice' because they were in 'some way concerned or associated in the commission of the crime'. See McLendon v. United States, 8 Cir., 19 F.2d 465, 466; Johns v. United States, 10 Cir., 227 F.2d 374; Cleaver v. United States, 10 Cir., 238 F.2d 766.
 
 
 42
 It may be conceded arguendo that these witnesses came within the category of an accomplice by virtue of their membership in or affiliation with the Communist Party and their association with the appellants. Even so, we think the trial court's careful instruction on the weight to be given the testimony of former members of the Communist Party and 'socalled informers' was entirely sufficient to caution the jury concerning the treatment to be accorded the testimony of these particular witnesses.[8]
 
 
 43
 Judgment is affirmed.
 
 
 
 [1]
 Before and after the commencement of the alleged conspiracy and until 1955, Travis was Secretary-Treasurer of the Union; Wilson was first International Representative, later Executive Board Member, and then Vice President of the Eastern territory. Sanderson was a member of the office staff and most of the time acted as Assistant to the President. VanCamp was Board Member of District 3 and was succeeded by Dennis. Dichter and Skinner were International Representatives. When in 1955 Pezzati succeeded Travis as Secretary-Treasurer, Dichter succeeded him as Board Member from District 6. Dennis was first an International Representative and later succeeded VanCamp as Board Member from District 3
 
 
 [2]
 At the Bessemer meeting in the Summer of 1949, attended by Hudson (a Communist Party functionary), Lawrence, Fikes, Wilson, Hall (a local Party official) and others, Fikes testified that Hudson (who was not a member of the Union) stated, 'decision had been made by the Party that officials of the union (Mine Mill) were to comply with the Taft-Hartley law. * * * So, he (Wilson) said that they would sign a letter of resignation to the Party, and that they would see that this got into New York-- the letter of resignation from the party. But they would continue-- that this would be on paper only, a piece of paper-- and that they would continue to read the Party press, give donations and it was of utmost-- it should be utmost in everybody's mind that the security was the most important thing at this time, because they had to sign this letter of resignation from the Party and was supposed to be out where they could sign the affidavit. * * * he said that he had been to a Board meeting and also met with Party people, and that he was opposed to signing the affidavit on principle, but something had to be done. They had to do something to save the Union. And so therefore he went along with this, that they should resign, write a letter of resignation and should sign the affidavit. * * * Also he spoke of a liason' between the Party and the Union
 Lawrence testified that at the same meeting 'Mr. Wilson reported that the Executive Board had taken action to comply with that provision of the Taft-Hartley Law involving the signing of non-Communist affidavits. He said that all of the Executive Officers-- that is, those who, under the law, were to sign the affidavits-- had to resign from the Communist Party, that in all except one case this took the form of signing letters which were deposited with local functionaries in each area, in which they resigned from the Communist Party and that in the person of the Secretary-Treasurer (Travis) it was a matter of public resignation.
 'He went on to say that from this point on none of the Executive Officers, or none of the Taft Hartley-ites, as I believe the term can be used, could have any connection with the Communist Party, could not attend meetings, could not-- Let me go over that again-- that they could not attend meetings, they could not meet with Party officials, and could not make contributions directly to the Communist Party.
 'But insofar as Staff members were concerned, there would probably be coordination of their Party activities from that point on primarily within the Union rather than in terms of a series of connections with local Party organizations, but that the details had not yet been worked out.
 'But he had indicated that there would be some change in terms of less connection and also in terms of money going into a different area than the local party organizations. This is my best recollection of his report.'
 
 
 [3]
 Mr. Justice Black, speaking for the Court in Krulewitch v. United States, supra, states: 'There are many logical and practical reasons that could be advanced against a special evidentiary rule that permits out-of-court statements of one conspirator to be used against another. But however cogent these reasons, it is firmly established that where made in furtherance of the objectives of a going conspiracy, such statements are admissible as exceptions to the hearsay rule. This prerequisite to admissibility, that hearsay statements by some conspirators to be admissible against others must be made in furtherance of the conspiracy charged, has been scrupulously observed by federal courts.'
 
 
 [4]
 Some were admitted to show Party-Union policy prior to the alleged formation of the conspiracy, and they were, we think, competent to lay the foundation for the agreement
 
 
 [5]
 See Goldstein, Conspiracy to Defraud the United States, 68 Yale L.J. 405 (1959)
 
 
 [6]
 The federal courts have been roundly criticized for their 'paltry interpretation' of the statutory law and federal rules of discovery. Chief Justice Roger Traynor has recently accused federal judges of continuing 'to bar discovery upon the rationalization, at odds with the apparent intention of the draftsmen of the rules, that failure to authorize discovery is an implied prohibition of it. * * * the federal courts fail to exercise their inherent power to foster a wholesome integration of discovery procedures into the judicial process.' 'Ground Lost and Found in Criminal Discovery', Vol. 39, N.Y.L.R., April 1964, pp. 228, 238, 240. See Jones v. Superior Court of Nevada County, 58 Cal.2d 56, 22 Cal.Rptr. 879, 372 P.2d 919. See also 111 U.Pa.L.R. 1154, 1181-1195
 
 
 [7]
 It is admitted that the notes were destroyed in good faith in accordance with established practice of the FBI
 
 
 [8]
 The Court instructed the jury, 'In weighing the testimony given by former members of the Communist Party, you should consider whether the circumstances of their membership or their leaving the Party might have given rise to some hostility or prejudice against the Communist Party or against these defendants which might affect the accuracy or truthfulness of their testimony
 'The evidence shows that certain of the Government's witnesses were in times past engaged by the Government as confidential informants to join the Communist Party and make reports to the Federal Bureau of Investigation of such facts as they learned during such association, and they were paid considerable sums of money for their long service while so engaged for procuring evidence, including among other things with respect to the activities of the defendants. In weighing the testimony of such witnesses you should scrutinize their testimony with greater care and caution than if they were not so engaged. In this connection, it should be borne in mind it is sometimes necessary in proving the commission of certain crimes for the Government to rely upon evidence furnished by these socalled informers. All of the factors which might act as an inducement to a witness to deviate from the truth or to color testimony should be considered by you. However, you should not infer that the existence of any of these factors or any one of them in relation to some of the witnesses is of itself sufficient to discredit such witness' testimony. A witness who is a former member of the Communist Party or an informer or who by reason of interest, hostility, bias or hope of reward might be induced to give false testimony may nevertheless testify accurately and truthfully. If you find that such witness has testified truthfully, then such testimony is as good as the truth testified from any other source. What the fact is in this regard as to all the witnesses for both the Government and the defendants is for you to determine in the light of all the circumstances and in accordance with your experience and best judgment.'