**UNITED STATES, Appellant,**

v.

**Willie C. ANDERSON and Archie L. Lonon,**
**Appellees.**

**No. 7962.**

District of Columbia Court of Appeals.

Argued Sept. 12, 1974.

Decided Nov. 12, 1976.

———◆———

Garey G. Stark, Asst. U. S. Atty., Washington, D.C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Richard L. Cys, Asst. U. S. Attys., Washington, D.C., were on the brief, for appellant.

Jeffrey R. Freund, Washington, D.C., appointed by the court, for appellee Lonon.

Melville Feldman, Washington, D.C., appointed by the court, for appellee Anderson.

Before KELLY, FICKLING and HARRIS, Associate Judges.

PER CURIAM:

This government appeal pursuant to the provisions of D.C.Code 1973, § 23–104(a)(1) is from a homicide case in which one of several investigating officers failed to preserve his notes of an initial interview of Special Police Officer James Saunders, a guard at the Veterans Administration Hospital where the incident occurred. In a pretrial hearing the court determined that the notes fell within the purview of the Jencks Act, 18 U.S.C. § 3500 (1970), and concluded that the nonproduction of the lost material warranted the sanction of a prospective bar to the witness' trial testimony.[1] We reverse.

Introductory facts essential to an understanding of the issues are that in the early afternoon of December 6, 1972, a murder was committed in the drug ward of the Veterans Administration Hospital. Special Police Officer Saunders, responding to a radio call for assistance, encountered two men and a woman hurriedly leaving the building where the shooting had just occurred. When they failed to stop, Saunders engaged in pursuit and ultimately apprehended appellee Anderson.

Officers Willie Morris and William Prudden of the Metropolitan Police Department arrived at the scene about 1 p.m., and began an investigation which included the questioning of Officer Saunders. They were joined by Officers Melvin Johnson and Warner Washington, who interviewed two members of the hospital staff, Mr. Schift and Miss Bates. In his interview of Saunders, Morris apparently took several pages of notes which he gave to Prudden for delivery to the Department's homicide section. Several hours later, Prudden was interviewed by Detective Paul O'Brien, and signed a statement concerning the details of his investigation of the homicide, but both he and the detective testified that they could not remember whether he had surrendered Morris' notes of the initial interview of Saunders. At 2:40 p.m. that afternoon, the homicide section also questioned Saunders, who signed a two-page statement recounting his recollections of the incident.[2] As a result of the investigation, appellees were charged with first-degree murder, felony murder, second-degree burglary while armed, and second-degree burglary. D.C.Code 1973, §§ 22–2401, –1801(b), and –3202.[3]

A pretrial hearing was held to determine, *inter alia,* the possible applicability of the Jencks Act to the notes taken by Officers Morris, Johnson, and Washington, the originals of which apparently were lost or thrown away.[4] The court heard the

---

1. While we do not discuss issues not raised on appeal, we quote with approval the statement in *United States v. Perry,* 153 U.S. App.D.C. 89, 99 n. 43, 471 F.2d 1057, 1067 n. 43 (1972), that

 Ordinarily a Jencks Act question would not arise or be resolved at a pre-trial hearing. "Suppression hearings are nowhere alluded to in the legislative history and the statute does not supply any direct guidance for conduct at such hearings." *United States v. Covello,* 410 F.2d 536 (2d Cir. 1969). In this Circuit, however, a frequent practice has developed of determining Jencks Act issues prior to the commencement of trial. This practice is both efficient and consistent with the policies behind the Jencks Act. If the court waits until trial to determine whether evidence is producible under the Act, continu-

 ances must often be granted and delays in the trial are inevitable.

 While we approve pre-trial determinations of Jencks Act issues, we do not hold that they must always be decided prior to trial. Situations may arise in which it is more appropriate to wait until evidence is submitted at trial before making a determination. The course to be followed in a particular situation is left to the reasonably exercised discretion of the trial judge.

2. *See* appendix to this opinion.

3. Appellee Lonon also was charged with carrying a pistol without a license. D.C. Code 1973, § 22–3204.

4. The hearing was held just before trial was to begin. At the time counsel for appellees had copies of all Jencks material which the

testimony of Morris, Prudden, Johnson, and Washington, as well as that of Detective O'Brien and Lt. John J. Moriarity, their supervisor. There was no testimony from Saunders or any of the other prospective government witnesses the interviews of whom had resulted in the missing notes.[5]

The court held the Jencks Act's sanctions inapplicable to the unavailability of the notes which Officers Johnson and Washington had taken of the information provided by Mr. Schift and Miss Bates. It concluded that the material did not fall within the statutory concept of a "statement" [see 18 U.S.C. § 3500(e)], and further suggested that its unavailability was neither prejudicial to the defendants nor the result of negligence or bad faith on the part of the officers.

As for the loss of Morris' notes of his interview of Saunders, however, the court reached a contrary conclusion. Pointing to the fact that Morris acknowledged that he had written several sheets of notes in an effort to take down "substantially everything" that the witness said, and that the interview had been conducted over a period of up to 15 minutes, the court concluded that the notes were distinguishable from the abbreviated information which can result from the initial contact between a witness and an officer anxious to begin pursuit of the perpetrator of the offense. It characterized the notes as "preservable" material within the purview of the Jencks Act, and, concluding that there was "[n]o satisfactory explanation" for their unavailability, imposed the sanction of a total prospective bar to Officer Saunders' testimony at the upcoming trial. It is that order from which the governemnt appealed.

For purposes of our resolution of this appeal we assume the validity of the trial court's finding that the Morris notes constituted a substantially verbatim statement of the witness Saunders which was producible under the Jencks Act. It is the court's rationale in reaching its decision to bar Saunders' testimony at trial which we question, for in ruling that appellees were prejudiced by the government's inability to produce Morris' notes the trial judge stated that he was "satisfied that there's no document prepared by any police officer of record which contains the information as secured from Officer Saunders. . . ."[6]

*See, e.g., Moore v. United States,* D.C. App., 353 A.2d 16 (1976). Strangely enough, the trial judge reached this conclusion by comparing Saunders' verbatim statement to the homicide section with that of Officer Prudden. It is difficult to see, however, how the fact that the substance of Morris' notes were not incorporated in Prudden's statement necessitated the prospective striking of Saunders' trial testimony in this case.

As noted above, Officer Morris arrived at the Veterans Hospital and spoke to Saunders about 1 p. m., shortly after the homicide. According to Morris' testimony at the hearing, Saunders told him:

There was a car that may have been involved in the shooting. It was a white Oldsmobile. And that there was a woman in it and another fellow that was in the car that he tried to stop as they came out of the entrance, running out of the entrance of the Veterans Administration Hospital, but was not able to stop them. They got in the car and drove out of the grounds of the hospital on Irving Street, where they made a left

---

government possessed since the government had been ordered to furnish such material to defense counsel three days before trial.

5. Officer Saunders was present in court on the second day of the hearing, ostensibly to testify on a pending motion to suppress

identification testimony and/or a motion to suppress post-arrest statements of appellee Anderson. Apparently neither counsel nor the court felt that his testimony was needed in order to resolve the pretrial Jencks motion.

6. Tr. 184.

and went west on one of the blocks of Irving. One of the suspects was a patient in the hospital who also tried to get in the same automobile, but wasn't able to. He was able to catch this particular person and to arrest this particular person.[7]

Scarcely an hour and three quarters later Saunders gave virtually the identical information, and more, to the homicide section in a verbatim statement which he signed and acknowledged as correct, a copy of which had been given appellees.[8] Clearly the substance of Saunders' statement to Morris was also contained in Saunders' own verbatim statement to homicide less than two hours later.[9] Under these circumstances, the possibility of prejudice to appellees because of the loss of Morris' notes was either minimal or nonexistent. As the trial court concluded with respect to the Bates and Schift statements, "[I]t would appear that the (appellees) have received that fresh type of recollection that the courts speak of as possessed by a witness at a date and time near the offense."

We conclude that in this case the imposition of the ultimate sanction under the Jencks Act was unwarranted and that the court erred in barring the testimony of Officer Saunders. *See United States v. Perry*, 153 U.S.App.D.C. 89, 471 F.2d 1057 (1972).

*Reversed.*

7. Tr. 33.

8. There had been extensive pretrial discovery in this case. In a commendable spirit of cooperation the government had furnished counsel with a wealth of information, including a transcript of the radio run, Officer Prudden's PD 251 as well as his statement to homicide and the handwritten notes of his interview with the witness Bates, Officer Johnson's statement to homicide, the autopsy report, and the minutes of the grand jury. Counsel were also advised of Anderson's post-arrest statement to the police, the substance of the eyewitness testimony, the results of a neutron activation test, and the basis for the identification testimony. Before Saunders' statement was produced, counsel for

# APPENDIX

OFFICE OF THE HOMICIDE SECTION

METROPOLITAN POLICE DEPARTMENT

WASHINGTON, D.C.

WEDNESDAY, DECEMBER 6th 1972

Statement began at 2:40 p. m.

STATEMENT OF: JAMES SAUNDERS, male, 31 years of age, residing at 4501 Clermont Drive, Northeast, Washington, D.C., apartment 201, telephone 529–2734, employed by the Veterans Hospital Special Police Force, telephone 483–6666.

I did not know the man that was killed.

I do not know the person or persons that killed him.

It was between 12:00 and 1:00 p. m., today, I was out front of the main entrance of the hospital directing traffic, when I received a call from the operator on my two way radio, to go to 3–C–North, stat, (that means as fast as I can).

On my way inside the building just as I was going inside the building at the main entrance, I was met by two men and a woman that were leaving the building and they were running. I didn't know what was going on but figured they were involved someway by the way they were act-

Lonon knew from a pretrial discovery conference that

". . . Mr. Saunders, a security guard, apprehended Anderson, but Anderson broke away and returned to the front of the building where he was observed to hand car keys to Lonon who was then accompanied by a female. Lonon entered the car and drove away. (R. 267) . . . Saunders, of course, identified Lonon as the man leaving the hospital with Anderson. (R. 268) Officer Saunders' license plate observation. Saunders got two letters of a temporary D.C. license plate on the car in which Mr. Lonon disappeared. Those letters are DX. (R. 269).

9. Saunders' interview apparently was already under way when Prudden began his statement.

ing and I tryed to stop them but they would'nt stop. They kep right on out the front door and right on running.

I started up to 3–C–North then I changed my mind, I met this other guard by the name of Parker, no its Parks and he told me that one of the subjects was wearing a white leather jacket. At this time I remembered that one of the three subjects that had run from the building had been wearing a white jacket but it was not leather, and I still did'nt know what had really happened.

I ran back out side then and the one wearing the white jacket was sitting inside the car at the front entrance. The same lady that had run out earlier was standing along side the car on the passenger side. The fellow in the white jacket was seated on the passengers side inside of the vehicle. This other fellow had run all the way down the bottom of the hill to Irving street, to where the entrance to the hospital was. I got into the patrol car which was parked in front and I went after him. I caught up to him on Irving Street, at the entrance and I told him to get into the car that I was taking him back to the hospital. He stated "he was going home". I asked him what had happened and he stated "some big guy had come up and hit him in the face".

I took him back to the main entrance of the hospital, I thought at this time that maybe this one that I had, might have been fighting with the one in the white coat.

Also when I got back the one in the white coat and the lady that was with him was not inside the car. After I arrived back at the main entrance they both came out of the patient's entrance together, and I told them to wait a minute that I wanted to talk with them. The one that was with me said "that's not the one"., and then the lady spoke up and said no "he's not the one". The I took the one that I caught back inside to the guard office. As I was leaving the guy in the white jacket was getting back into the car on the drivers side and the woman was getting in on the passengers side. I told Mr. Manley to get the license number of the car in case they might be involved.

I remember when I bought back the one that I had caught, the fellow in the white jacket asked my man for his keys. He reached into his robe pocket (I think it was the right side) and threw the keys to him)

When I got to the guards office I turned this man over to Mr. Parks. From there I went to the ward 3–C–North and learned it was a shooting and saw the man lying on the floor.

Questions by Detective Roy Lamb.

Q. Can you describe the man in the white jacket for me?

A. He's a negro, male, 5′ 8″, 170 lbs., dark skin, short beard, bush, but I don't know how long it was, he was wearing red trousers and a white waist length jacket, which looked like it might have some wool in it, and I think it was open. He had a shirt on under the jacket but I don't know what kind. He was in his 20's.

Q. Can you describe the woman that was with this man?

A. Negro, female, in her 20's, 5′ 6″, 135–140 lbs, dark brown complexion, I think she had a bush too. I think she was wearing slacks, I don't remember the rest.

Q. Can you describe the third subject for me?

A. Negro, male, 30's, 5′ 9″ Or 10″, brown skin, short beard, bald in the top, brown and white strip hospital pajamas, and a brown and white stripe robe.

Q. When you first saw the above three subjects were they all leaving the hospital together?

A. They were coming out the door together.

Q. Did any of these three subjects every tell you there name?

A. No.

Q. Can you describe for me the car that the man in the white jacket and the above describe lady were sitting in?

A. Its a Oldsmobile 63–64 "88" or 98, its a big olds, white, with paper temporary tags. Car was in pretty good shape.

Q. Did you get the tag number of this vehicle?

A. I seen that the first two letters were "DX.".

Q. What did the man in the hospital clothes have on his feet?

A. Bed room slippers.

Q. Is there anything else you wish to add to this statement that has not already been covered.

A. No.

Statement given to and typed by Detective Roy Lamp Statement completed at 3:50 p. m., Wednesday, December 6th 1972.

/s/ James Saunders

I have read this two page statement and found it to be true and correct to the best of my knowledge.

HARRIS, Associate Judge:

In the recent past, a series of inconsistent appellate decisions forced the Youth Corrections Act through a tortuous course until the Supreme Court announced its definitive interpretation thereof in *Dorszynski v. Unit-*ed States, 418 U.S. 424, 94 S.Ct. 3042, 41 L. Ed.2d 855 (1974). *See, e. g., cases cited id.* at 425 nn.1 & 2, 94 S.Ct. 3042. *Cf. id.* at 453–54 n.18, 94 S.Ct. 3042 (Marshall, J., concurring in the judgment). The Jencks Act, regrettably, has been—and is being—subjected to similar interpretive cross-currents, and the majority has chosen a manner of disposing of this case which needlessly risks obfuscation.

I concur in the reversal and remand. However, in light of the majority's unwillingness to deal with what I consider to be the most vital question presented by the record before us, I express my disagreement with the rationale given for the result reached.

I

Both the government and appellees limited their arguments to the issues of whether the trial court correctly concluded that Officer Morris' on-the-scene notes of his interview with the witness Saunders amounted to a producible "statement" under the provisions of the Jencks Act [18 U.S.C. § 3500(e) (1970)], and, if so, whether the court properly suppressed the prospective testimony of Officer Saunders. *See id.* § 3500(d). However, those arguments overlook the underlying question of whether such a coercive application of the Act was erroneously premature, an issue which the majority is content to ignore.[1]

The Jencks Act was enacted both to regularize and to limit defense access to statements and reports of prospective prosecution witnesses within the government's files. *See Palermo v. United States*, 360 U.S. 343, 346–48, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); *March v. United States*, D. C.App., 362 A.2d 691, 698 (1976). *See also Moore v. United States*, D.C.App., 353 A. 2d 16, 20–30 (1976) (Harris, J., dissent-

---

1. The majority simply rules that, in light of the fact that within two hours of the incident Saunders gave a homicide section detective a complete statement (which was preserved and unquestionably was producible under the Jencks Act), the prejudice resulting from the loss of the on-the-scene notes was "minimal or nonexistent." I agree with this naked conclusion; however, it begs the issue.

ing). Its provisions are detailed as to the scope of its intended reach and the circumstances under which it may be applied. 18 U.S.C. § 3500 provides in pertinent part:

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. . . .

These provisions leave no doubt that the obligation of the government to produce material properly falling within the contemplation of the Act, and hence the authority of the trial court to order such production (or to impose a sanction in the event of nonproduction) does not arise unless and until the declarant-witness has "testified on direct examination in the trial". There is no provision in the statute for its pretrial application, and courts consistently have rejected premature attempts to employ the statute's discovery mechanism. See e. g., *United States v. Scott*, 524 F.2d 465, 467–68 (5th Cir. 1975); *United States v. Spagnuolo*, 515 F.2d 818, 820–21 (9th Cir. 1975); *United States v. Sebastian*, 497 F.2d 1267, 1269–70 (2d Cir. 1974). *See also United States v. Peterson*, 524 F.2d 167, 175 (4th Cir. 1975), *cert. de-*

*nied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed. 2d 99 (1976); *United States v. Feinberg*, 502 F.2d 1180 (7th Cir. 1974), *cert. denied*, 420 U.S. 926, 95 S.Ct. 1122, 43 L.Ed.2d 396 (1975); Annot., 7 A.L.R.3d 181, § 17 (1966).

This court has recognized a limited expansion of the statutory concept of "trial of the case" to include pretrial suppression hearings. *United States v. Dockery*, D.C. App., 294 A.2d 158 (1972). However, we unequivocally have recognized the threshold requirement of in-court testimony by the putative declarant. In *Savage v. United States*, D.C.App., 313 A.2d 880, 883 (1974), we observed:

While it is now settled that Jencks Act material is properly producible at the hearing on a pretrial motion to suppress, see *United States v. Dockery* . . ., it is also settled that the Jencks Act applies only where the witness, who is the putative source of the material, has himself testified, *United States v. Dockery*, *supra* at 161, and the notes are "'substantially verbatim' statements within the meaning of the Act." *See United States v. Hines*, 147 U.S.App.D.C. 249, 264, 455 F.2d 1317, 1333 (1972). [Footnote omitted. *See also Jones v. United States*, D. C.App., 343 A.2d 346 (1975).]

Putting aside the question of whether the pretrial hearing which was held in this case could be construed as falling within the concept of "trial of the case",[2] I view as fatal to the challenged order the fact that at no time did the putative declarant-prospective witness give any testimony in the proceedings. *See* 18 U.S.C. § 3500(a) and (b) (1970). While the hearing devoted considerable attention to the officer who made notes of Saunders' on-the-scene remarks, and to the question of whether those notes amounted to a statement which

---

2. *Compare United States v. Dockery*, *supra*, *with Giboson v. Halleck*, 254 F.Supp. 159 (D.D.C.1966) (preliminary hearing), *and United States v. Sebastian*, *supra* (suppression hearing). *See also United States*

*v. Hodges*, 489 F.2d 212 (5th Cir. 1973) (probation revocation hearing); *Robbins v. United States*, 476 F.2d 26, 31–32 (10th Cir. 1973) (preliminary hearing).

should have been preserved, the guard himself was never put on the stand. As the Jencks Act was designed to facilitate the determination of truth by providing a vehicle for the possible impeachment of the government's witnesses [*see Palermo v. United States, supra,* 360 U.S. at 349, 79 S.Ct. 1217; *see also Hardy v. United States,* D.C.App., 316 A.2d 867, 869 (1974)], it is premature to invoke its limited principles before the government has incorporated the witness into its case by placing him on the stand. *Cf. United States v. Nobles,* 422 U.S. 225, 249–51, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1970) (White, J., concurring). To rule otherwise would be to treat the Act as a device for general discovery and a vehicle for possible pretrial suppression of testimony, which Congress never intended it to be. *See generally Palermo v. United States, supra; cf. March v. United States, supra,* at 700 and n.14; *Moore v. United States, supra,* at

20–30 (Harris, J., dissenting). As we observed in *United States v. Malcolm,* D.C. App., 331 A.2d 329, 333 (1975):

> [I]f there is one thing which is crystal clear about the Jencks Act, it is that compulsory disclosure by the government of documents in its possession is limited to prior statements of a witness who has testified.

Consistent with both the letter and spirit of the statute, I would hold that the trial court lacked the authority to require the government to produce the disputed material—and to impose, the Act's sanctions prospectively—before the declarant had given any in-court testimony.[3] *See United States v. Feinberg, supra; Sendejas v. United States,* 428 F.2d 1040, 1045–46 (9th Cir.), *cert. denied,* 400 U.S. 879, 91 S.Ct. 127, 27 L.Ed.2d 116 (1970); *Ogden v. United States,* 303 F.2d 724, 734 (9th Cir. 1962). *Cf. United States v. Harris,* 458

---

3. In footnote 4 of its per curiam opinion, the majority states without comment that "the government had been ordered to furnish [Jencks Act] material to defense counsel three days before trial." The majority's enigmatic silence on this subject cannot alter the statute or established case law; unquestionably the trial court was without authority to make such a directive. Not only is the language of the statute itself clear, but the legislative history of the Act leaves no doubt that the in-court testimony of the putative declarant is an essential prerequisite to an order of production. For example:

> [I]t is the specific intent of the bill to provide for the production of statements . . . after the Government witness has testified against the defendant on direct examination in open court, and to prevent disclosure before such witness has testified. [S.Rep.No.981, 85th Cong., 1st Sess. (1957), U.S.Code Cong. and Admin.News 1957, p. 1863.]

> The changes agreed upon by the conferees . . . make it abundantly clear that no such statement need be produced until said witness has testified on direct examination in the trial. [Conf.Rep.No.1271, 85th Cong., 1st Sess. (1957), U.S.Code Cong. and Admin.News 1957, p. 1870.]

This, however, is not to say that the trial court may not encourage the early recognition and resolution of potential Jencks Act ques-

tions. In a given case, the pretrial surrender of material properly within the limits of the statute before a particular witness testifies (assuming adequate assurances against harassment or intimidation of the witness) may contribute to a more informed determination on the part of the defense as to a possible guilty plea, or, failing that, may assist the efficient and orderly progression of the trial. As expressed by one court:

> The judicial machinery is under considerable pressure, and with good reason, to expedite the disposition of criminal cases. These pressures should be regarded as aplying to prosecutors as well as judges. The mere fact that the Jencks Act precludes the Court from ordering disclosure of a witness' statements until after the witness has testified does not mean that in every case government counsel should be unwilling to expedite matters by making these statements available at such times as will eliminate trial delays while opposing counsel reads the material. [*United States v. Goldberg,* 336 F.Supp. 1, 2 (E.D.Pa.1971). *See Sendejas v. United States,* 428 F.2d 1040, 1045–46 (9th Cir.), *cert. denied,* 400 U.S. 879, 91 S.Ct. 127, 27 L.Ed.2d 116 (1970); *United States v. Hilbrich,* 232 F.Supp. 111, 119 n. 10 (N.D.Ill.1964), *aff'd,* 341 F.2d 555 (7th Cir.), *cert. denied,* 381 U.S. 941, 85 S.Ct. 1775, 14 L.Ed.2d 704 (1965).]

F.2d 670, 675–77 (5th Cir.), *cert. denied sub nom. Scott v. United States,* 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972).

The result which I consider to be compelled herein would not alter the principles enunciated in *United States v. Dockery, supra,* and its limited extension of the Jencks Act. While we acknowledged in *Dockery* that our decision went beyond the letter of the statute, we reasoned that under the circumstances the application of the Act to suppression hearings was not a radical departure from the statutory concept of "trial of the case". *See United States v. Malcolm, supra,* at 331 n.1; *cf. United States v. Curran,* 498 F.2d 30 (9th Cir. 1974). Our concern was that to deny defense access to previous statements made by the very witnesses actually relied upon by the government at a suppression hearing would hamper possible impeachment, and thus would restrict unfairly the accused's principal opportunity to challenge what might prove to be the most critical evidence in the case against him. Moreover, we concluded that the withholding of the government witnesses' possibly inconsistent prior statements until the subsequent trial would undermine the intended effectiveness and efficiency of such pretrial proceedings. *United States v. Dockery, supra,* at 160–64. *Cf. United States v. Sebastian, supra,* at 1270; *United States v. Greer,* 297 F.Supp. 1265, 1272–73 (N.D. Miss.1969).

*Dockery,* however, differs from the instant case in that there the putative declarants were called to give testimony at the pretrial hearings. Moreover, the respective trial courts, whose rulings were consolidated on appeal, narrowly focused their applications of the Act to the particular issues before them; that is, having concluded that the requested police reports (which were in the government's possession) should have been surrendered to defense counsel after the arresting officers had testified, the courts responded to the government's refusal to do so by striking the testimony of the affected witnesses. The rulings were limited and based upon the conclusion that in the absence of such testimonial evidence, the validity of the seizures had not been demonstrated and the disputed items were to be suppressed. *United States v. Dockery, supra,* at 160–64. *See also Savage v. United States, supra,* at 883. *But see United States v. Malcolm, supra.* There is a vast difference, however, between striking a witness' testimony on a particular issue such as the legality of a search, after he has testified and the government has declined to produce his relevant extrinsic statement, and barring prospectively all testimony by an individual who, in light of the fact that he has given no testimony, has not yet become a part of the government's case. *Cf. United States v. Perry, supra.*

It is, of course, well settled that the proper administration of a so-called Jencks Act hearing lies within the responsibilities of the trial court.[4] *See Campbell v. United States,* 365 U.S. 85, 81 S.Ct. 421, 5 L. Ed.2d 428 (1961). *See also Jones v. United States,* D.C.App., 343 A.2d 346, 350 n.10 (1975); *Alexander v. United States,* 118 U.S.App.D.C. 406, 336 F.2d 910, *cert. denied,* 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed.2d 346 (1964). While such proceedings normally take the form of in-trial consideration of extrinsic evidence concerning the requested material outside the presence of the jury [*see, e. g., Campbell v. United States, supra,* 365 U.S. at 92, 81 S.Ct. 421; *Williams v. United States,* D.C.App., 355

---

4. "[The Jencks Act] implies the duty in the trial judge affirmatively to administer the statute in such way as can best secure relevant and available evidence necessary to decide between the directly opposed interests protected by the statute—the interest of the Government in safeguarding government papers from disclosure, and the interest of the accused in having the Government produce 'statements' which the statute requires to be produced." *Campbell v. United States,* 365 U.S. 85, 95, 81 S.Ct. 421, 427, 5 L.Ed.2d 428 (1961).

A.2d 784 (1976); *cf. Wilburn v. United States,* D.C.App., 340 A.2d 810 (1975)], we have approved a pretrial recognition of the presence of Jencks issues. *See, e. g., Jones v. United States, supra; Savage v. United States, supra.* Neither the statute nor the relevant case law precludes the use of a pretrial hearing to determine the existence of potential Jencks material. *But see Jones v. United States, supra,* at 348 n.5. It lies within the trial court's sound discretion whether to grant a defendant's request for a hearing on such questions, and, as noted above, such a proceeding may prove beneficial to the efficient and orderly progression of the ensuing trial.

To conclude that the trial court may use a pretrial Jencks hearing to consider whether a document in the government's possession appears to fall within the Act's definitions of a "statement" [18 U.S.C. § 3500(e); *see March v. United States, supra; Moore v. United States, supra*], however, is not to say that the trial court may exceed its limited statutory authority by then either ordering the production of the requested material or imposing a prospective sanction against the government for its nonproduction. *See Jones v. United States, supra.* By the express language of the statute, such authority does not arise until the putative declarant has testified "on direct examination in the trial of the case".[5] 18 U.S.C. § 3500(a) and (b). *See Jones v. United States, supra; United States v. Feinberg, supra,* at 1182. Moreover, as we indicated in *Dockery,* even where the declarant has given testimony at a pretrial hearing, the propriety of compelling the production of the requested docu-

ment at that time would depend upon the proper satisfaction of the statute's further prerequisites to disclosure (*e. g.,* that the document in question would be relevant to the witness' pretrial testimony), and whether the substance of the pretrial testimony and related Jencks material is necessary to the proper resolution of the matter at issue in that hearing (*e. g.,* the granting of a motion to suppress tangible evidence). Where the only pretrial issue is the possible existence of Jencks material that is potentially relevant to the anticipated trial testimony of one of the government's witnesses, there is no legal justification for circumventing the plain language of the statute by bootstrapping the authority necessary to compel advance disclosure simply because the declarant may have been put on the stand prior to the trial on the merits.

II

The facts of this case demonstrate the absurd results which can flow from an improper application of the statutory principles. The homicide occurred at approximately 1:00 p. m. Responding to a radio call, Special Police Officer Saunders encountered three people—apparently including our two appellees—running from the hospital. When they refused his command to stop, he pursued and apprehended appellee Anderson. The officer also later identified appellee Lonon. Obviously, Saunders is a critical government witness. Investigating Metropolitan Police officers interviewed the guard twice. The initial questioning was conducted over a period of 10–15 minutes by Officer Morris at the

5. My conclusion that, absent the circumstances presented in *United States v. Dockery, supra,* the trial court lacks the authority to penalize the government for its unwillingness to produce the requested documents before the trial on the merits, is supported by the nature of the statutory sanctions to which the court is limited [18 U.S.C. § 3500(d)]:

(d) If the United States elects not to comply with an order of the court . . . to deliver to the defendant any such statement, or such portion thereof as the court

may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

Clearly if the declarant has given no testimony there exists nothing which the court can "strike from the record"; moreover, until the case has progressed to a trial on the merits, it is meaningless to suggest the declaration of a mistrial.

hospital, and resulted in the disputed notes. Saunders then went to the homicide section, where he was interviewed from 2:40 p. m. to 3:50 p. m., approximately two hours after the homicide. This session resulted in a detailed statement, signed by Saunders, which was available to the defense.[6] In practical terms, the question is: Should the government be deprived of a key witness who caught the apparent felons in flight simply because an officer misplaced his on-the-scene notes, the substance of which was otherwise available to the accused? I agree with the majority that it should not.

The limited scheme of discovery embodied in the Jencks Act is not grounded upon a right secured to the accused by the Constitution [see *United States v. Augenblick*, 393 U.S. 348, 356, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969)], nor can it be viewed as creating a new exclusionary rule. See *Moore v. United States, supra*, at 27–28 (Harris, J., dissenting). From the accused's perspective, the sole concern of the Act is to provide a means whereby he can put the government's case to the test of possible impeachment. See *March v. United States, supra*, at 698. On the facts of this case, in which the loss of the officer's field notes was more than offset by the availability of the unabridged recollections of the witness which were recorded as a true "statement"

almost immediately after the incident, I agree that appellees' capacity for possible impeachment has not suffered any cognizable detriment. To bar prospectively the trial testimony of Officer Saunders not only exceeds the statutory authority of the court, but also would provide the defendants with an entirely unjustifiable windfall.[7]

At the pretrial hearing, the court obviously was aware of the dangerous implication of an unrestrained application of the statutory principles. At that time (October 1973), the relevant case law provided little guidance. Considerable attention was given to the Police Department directive that all investigatory notes be retained.[8]

The court observed:

> One of the difficulties I have with these Jencks problems is that I think the police regulations go further than the Jencks Act requires. I've never been satisfied that notes which contain nothing more than a description obtained by a police officer for the purpose of putting out a flash on a radio broadcast, even though they're the words of the witness who gives it to him—I've never been satisfied that that is Jencks material. But under this regulation that the police department has enacted, the individual officers are instructed to retain those notes.

6. In *March v. United States, supra*, at 700 n. 13, we specifically endorsed the following statement made by Mr. Justice Stevens in his concurring opinion in *Goldberg v. United States*, 425 U.S. 94, 112, 96 S.Ct. 1338, 1349, 47 L.Ed.2d 603 (1976) :
 Whether a particular writing is an original or a copy, it is not a statutory "statement" unless it reflects the witness' own words fully and without distortion.

7. However desirable the careful preservation of all investigatory material may be, such is not the intended purpose of the Jencks Act. See *March v. United States, supra*, at 698 n. 8 and 703–04. Moreover, we should not overlook the substantial societal costs of efforts to achieve such an objective by a rule which may render the ability to prosecute successfully a function not of the evidence pointing to the guilt of the accused, but rather of the fortuitous nature of the in-

vestigatory activities of law enforcement officials. In *Stone v. Powell*, —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), Mr. Justice Powell, writing for the Court, considered the impact of the exclusonary rule embraced in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and its progeny. The Court stated [—— U.S. at ————, 96 S.Ct. at 3049–50] :
 The costs of applying the exclusionary rule even at trial and on direct review are well known: the focus of the trial, and the attention of the participants therein, is diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. [Footnote omitted.]

8. Metropolitan Police Department General Order Series 601, No. 2 (effective May 26, 1972, as amended Sept. 1, 1972).

Following two days of testimony by six police officers, the court correctly concluded that the notes taken during the interview of Mr. Schift and Miss Bates were not within the statutory purview.[9] However, based on Officer Morris' testimony that he had attempted to take down virtually everything Saunders said, and in light of the fact that those particular lost notes had not been incorporated in any other producible material, the court ruled that the missing material constituted a "statement" within the Act, and barred any testimony by the witness at the upcoming trial. Nevertheless, it candidly acknowledged its reluctance to reach such a conclusion:

> I hope [that the Government decides to appeal the order] because I think that it's about time the trial courts be assisted by a definitive ruling on these Jencks Act problems. This is . . . far from the first occasion where we have, in this Court alone, the difficulties of notes secured by the police in the investigation of the case.

Intervening case law has responded to the concerns voiced by the trial court. *See, e. g., Goldberg v. United States,* 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976); *March v. United States, supra; Brown v. United States,* D.C.App., 359 A. 2d 600 (1976). Central to the proper application of the Jencks Act are its detailed provisions specifying the nature of the materials to which a defendant's statutory right of discovery is expressly limited. The Act provides that where the material has not been written by the witness or otherwise adopted or approved by him, it is not subject to compelled production unless it is a "contemporaneously recorded, substantially verbatim" account of the witness' statement. 18 U.S.C. § 3500(e). As the trial court observed, lost field notes taken by investigating officers have presented a chronic problem in the Act's administra-

tion, but a recognition has developed that because of the hurried and unfavorable circumstances under which such material typically is gathered, it would rarely, if ever, be sufficiently complete to be considered "substantially verbatim." *See, e. g., March v. United States, supra; Moore v. United States, supra,* at 22 (Harris, J., dissenting). *Cf. Brown v. United States, supra.* The restrictive interpretation of the statutory concept of a "statement" which was recognized early in *Palermo v. United States, supra,* 360 U.S. at 352–53, 79 S.Ct. 1217, was reinforced in the recent decision by the Supreme Court in *Goldberg v. United States, supra.* Mr. Justice Powell, writing in concurrence, offered the following instructive analysis (425 U.S. at 125, 96 S. Ct. at 1355–56):

> In applying the Jencks Act to typical interview notes · . . ., we must remember that such notes do not fit within the core of the Jencks Act. * * * Subsection (e)(2), not relied upon in this case, requires a "substantially verbatim" reproduction of an "oral statement made by [the] witness and recorded contemporaneously." Typical interview notes are selective—even episodic—and therefore fall outside of subsection (e)(2). Even if "adopted or approved" by the witness, such notes were not written by the witness himself and therefore fall without the core of subsection (e)(1). Typical interview notes that allegedly have been "adopted or approved" thus lack important guarantees of dependability that Congress relied upon in the central concept of subsection (e)(1) and (e)(2). These guarantees, it should be noted, arise partly from the sense that a witness normally would have of "going on the record" when he makes a statement within the core of subsection (e)(1) or subsection (e)(2). It is to supply a comparable guarantee of dependability that the witness should know

9. The trial court also relied on the fact that their substance had been incorporated into both a radio run and a PD Form 251. *See Moore v. United States, supra. See also*

*Moore v. United States,* D.C.App., 363 A.2d 288, 290 (1976) (Harris, J., concurring in the result).

he is adopting the interview notes as a formalized statement. [Footnotes omitted.]

The majority employs a harmless error rationale to reach the conclusion that we need not pass upon the correctness of the trial court's finding that the lost notes constituted a "statement" within the meaning of the Act. Although I have serious reservations as to whether such a finding is consistent with the statutory provisions, my principal concern is directed to another point. While I fully agree with the majority's conclusion that the trial court committed reversible error in ordering a prospective bar to the trial testimony of Officer Saunders, I believe that the proper grounds for such a conclusion is not the absence of prejudice to the accused (*i. e.,* the harmlessness of the government's failure to preserve the original field notes), but rather the inescapable threshold point that the unambiguous statutory language withholds from the trial court the authority to impose any sanction under the Act until the affected witness has given testimony for the government.