2021 IL App (1st) 180521-U
No. 1-18-0521

SECOND DIVISION
February 23, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) | |
| v. | ) | No. 12CR16532 |
| KERRY ROGERS, | ) | |
| Defendant-Appellant. | ) | The Honorable Erica L. Reddick, Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's 38-year sentence affirmed where the totality of the circumstances reflected that the circuit court considered his status as a minor at the time of the offense and the attendant characteristics of his youth prior to imposing the sentence and where the sentence was not excessive.

¶ 2    Following a jury trial, defendant Kerry Rogers was convicted of first-degree murder and was sentenced to 38 years' imprisonment. On appeal, defendant argues that he is entitled to a new sentencing hearing because the circuit court failed to consider the statutory mitigating factors

applicable to juvenile offenders prior to imposing an excessive sentence. For the reasons explained herein, we affirm the judgment of the circuit court.

¶ 3     I. BACKGROUND

¶ 4     On July 19, 2012, 16-year-old Nathan Gonzalez was shot and killed. Defendant, who was also 16-years-old, was charged with first degree murder in connection to Gonzalez's death (720 ILCS 5/9-1(a)(1) (West 2012)). Given the nature and circumstances of the offense with which he was charged, defendant was subject to trial as an adult even though he was a minor at the time of the crime. See 705 ILCS 405/5-130(1)(a) (West 2012) (stating that juvenile offenders charged with first degree murder and those who personally discharge a firearm during the commission of such a crime are subject to prosecution under the regular "criminal laws of this State"). Defendant, ultimately, elected to proceed by way of a jury trial.[1]

¶ 5     Trial Proceedings

¶ 6     The evidence at trial revealed that defendant and Gonzalez were both students at Tilden High School. Gonzalez was a member of the Wild Nine street gang, a faction of the Gangster Disciples. Defendant was not a gang member; however, he associated with members of the Everybody Killer (EBK) street gang. The two groups were rivals and there was animosity between members of the rival gangs. In addition, there was animosity between defendant and Gonzalez as the two had altercations with each other at school.

¶ 7     At approximately 3 p.m. on July 19, 2012, defendant and Gonzalez encountered each other in the area of 59th Street and Ashland Avenue. Defendant and his younger brother were on a CTA

---

[1] Because defendant raises no procedural or evidentiary challenges to the trial proceedings and instead limits his appeal to contesting the sentence that he received at the conclusion of the trial, we elect to provide a brief summary of the relevant trial evidence instead of recounting the evidence at length.

bus and Gonzalez and several friends and fellow gang members, including Altwuan Kizer,[2] Latrell Franklin, and Vashawn Banks were milling around a Citgo gas station located near the bus stop. While the bus was stopped, defendant and Gonzalez interacted with each other through the bus window. Specifically, Gonzalez knocked on the bus window and pointed at defendant. In response, Franklin and Banks both observed defendant cock his finger and point at Gonzalez as if he was shooting him with a gun.

¶ 8      After the bus pulled away, defendant and his brother exited the bus several blocks later at the stop located at 55th Street and Ashland Avenue. Shortly thereafter, he encountered his cousin, J-Rock, his friend Alton Scott, and several other guys he knew. Defendant told Scott, a "Prince" in the EBK gang about his encounter with Gonzalez and Scott encouraged the defendant to "get" Gonzalez and his friends. Defendant, Scott, and several others then drove around in J-Rock's car looking for Gonzalez. After driving around for a while, defendant observed Gonzalez and his friends in the area of 59th and Laflin. Scott gave defendant a gun and defendant used the gun to shoot Gonzalez. Gonzalez was shot once in his back and once in his left buttock and died from his injuries. Kizer, Franklin, and Banks were all witnesses to the shooting.

¶ 9      Chicago Police Detective Harry Barsch responded to the scene of the shooting and interviewed Franklin and Kizer. During the interviews, the witnesses provided Detective Barsh with a description of the shooter, a nickname, and the name of the shooter's school. Based on the information that he received, Detective Barsh compiled a photo array and included defendant's picture in that array. Banks viewed the array on July 23, 2012, and identified defendant as the shooter. Kizer viewed the same photo array two days later and also identified defendant as the shooter. Defendant was subsequently arrested on August 7, 2012. That same day, he was included

---

[2] In its brief, the State mistakenly spells Altwuan's last name as "Fizer" rather than Kizer.

in a physical lineup and Franklin, Kizer, and Banks each identified him as the individual who shot and killed Gonzalez. Thereafter, defendant, in the presence of his mother, was advised of his *Miranda* rights, and agreed to provide a videotaped statement.

¶ 10    In his statement, defendant explained that when he was in the car with Scott looking for Gonzalez, he expected that the two groups would fight. He did not know that Scott was armed with a firearm until Scott gave him the gun and ordered him to shoot Gonzalez because Gonzalez was a Wild Nine gang member and the Wild Nine gang was responsible for killing one of their friends. Defendant described Scott as a "scary ass" and explained that he agreed to shoot Gonzalez because Scott threatened to do something to him if he did not comply. Defendant stated that he discharged the weapon in Gonzalez's direction while he remained seated in the vehicle. He did not think he would actually hit Gonzalez because he was firing the weapon from "far away." Instead, defendant believed that he would simply "scare" Gonzalez. After the shooting, Scott took the gun and drove off.

¶ 11    Although there was no dispute that defendant shot Gonzalez, Kizer, Franklin, and Banks testified at trial that defendant did not fire the weapon from a car. The witnesses first observed a black car circle the block twice. Shortly thereafter, defendant walked up to the group, reached into his waistband, pulled out a gun, and said "[W]hat's up now?." He then shot Gonzalez multiple times from a short distance away as Gonzalez was running away from him. According to Kizer, defendant "smirked" prior to shooting Gonzalez.

¶ 12    In addition to presenting live witness testimony, the State introduced defendant's videotaped statement into evidence as well as surveillance footage from the CTA bus and the Citgo gas station where defendant and Gonzalez first encountered each other on the day of the shooting. In addition, the parties stipulated to the testimony of the assistant medical examiner who conducted Gonzalez's

autopsy. Pursuant to that stipulation, the assistant medical examiner would testify that Gonzalez was shot twice: once in his lower back and once in his left buttock. Based on these findings, the assistant medical examiner concluded that Gonzalez "died of multiple gunshot wounds" and classified his death as a "homicide."

¶ 13    After the State rested, the defense presented a stipulation that on March 1, 2017, Banks told several ASAs that Gonzalez's mother, who had been caring for him, told him who to identify when he viewed the photo array in July 2012. The defense then admitted several exhibits into evidence. Defendant elected not to testify, and the defense presented no additional evidence.

¶ 14    Thereafter, the parties delivered closing arguments. After hearing the aforementioned evidence, the jury ultimately returned with a verdict finding defendant guilty of first degree murder. In addition, the jury specifically found that defendant personally discharged the firearm that resulted in Gonzalez's death. The cause subsequently proceeded to a sentencing hearing.

¶ 15    Sentencing Hearing

¶ 16    At the hearing, the court was presented with a Presentence Investigative Report (PSI). The PSI revealed that defendant's father was not a presence in his life and that both his mother and his grandmother had arrest records. Prior to his arrest for Gonzalez's murder, defendant attended Tilden High School where he received average grades and was a member of the school's football and basketball teams. Defendant admitted that he had used marijuana on a daily basis starting when he was 11 years old and that he had been suspended from school because of fighting. The PSI also indicated that defendant was hospitalized for one month when he was 14 years' old due to "anger issues." Since his arrest, defendant was under the care of a psychiatrist and was taking prescribed psychotropic medications.

¶ 17    Gonzalez's mother, Victoria, provided a victim impact statement in which she recounted the manner in which her son's death negatively impacted her family. She described her son as "loveable" and "respectful" and testified that his sudden death at the age of 16 was "devastating" to her, her husband, and her other children.

¶ 18    Defendant's mother, Tawana Spearman, in turn, testified on her son's behalf. She characterized her son as an "excellent" student and son. She testified that prior to defendant's arrest, he played sports, was an active member in his church community, and a role model to his six siblings who loved him. Spearman urged the court to give him a "second chance" and expressed her belief that defendant would "give back to society" if he was afforded an opportunity to do so.

¶ 19    Following Spearman's testimony, the defense presented the court with 8 letters written by several individuals who knew and supported defendant, including members of defendant's family and his church. For example, Irene Tripp, defendant's grandmother, characterized her grandson as a good and respectful child who "never gave [her] any trouble." In her letter, Tripp expressed her belief that he was capable of becoming "a better young man." Mrs. Booker, defendant's middle school teacher, wrote a letter in which she described defendant as being "full of hope and promise" and opined that he would become "productive member of society" if afforded the chance to do so. Father Denny Kinderman, a counselor at defendant's church, wrote that he found defendant to be "very respectful" and in possession of a "peaceful presence." Kinderman noted that defendant was "repentant" and requested the court to afford him leniency.

¶ 20    Thereafter, defendant provided a statement in allocution. In his statement, defendant began by apologizing to Gonzalez's family and acknowledged causing them a tremendous loss. He also acknowledged the love of his family, but testified that the circumstances of his childhood were

difficult. Defendant explained that he grew up in "pure poverty" and that survival was a "daily struggle." Growing up, his father was not in the picture and he shouldered responsibility to help his mother care for his five younger brothers. Defendant testified that he faced "constant danger" in the neighborhood in which he grew up. That environment, in turn, caused a part of him to turn "hard and sour" and resulted in him falling "deeper and deeper into the street." Although defendant believed that the circumstances of upbringing had "hardened" him, he also believed that there "was always a chance for [him] to be good." He concluded by acknowledging his "countless mistakes" and informed the court that he had "no intention" of returning to his old ways and that he simply wanted to be with his family.

¶ 21    Following defendant's statement, the parties delivered arguments in aggravation and mitigation. In aggravation, the State noted that defendant had been arrested several times as a juvenile prior to the shooting, but acknowledged that none of those arrests resulted in any subsequent criminal proceedings or delinquency adjudications. The State further observed that defendant had not been a model prisoner since his arrest; rather, he picked up two public indecency charges during his incarceration. The State acknowledged that defendant's status as a juvenile at the time of the shooting rendered the 25-year sentencing enhancement for personally discharging the firearm that resulted in Gonzalez's death discretionary rather than mandatory and that he was thus subject to a sentence between 20 and 85 years' imprisonment. The State, however, urged the court to impose the enhancement, arguing the facts of the case and the lack of mitigating factors did not justify a "minimum" sentence.

¶ 22    The defense, in turn, reiterated that defendant was only 16 years old at the time of the shooting and emphasized recent case law recognizing that juvenile offenders are "less culpable" and have greater rehabilitative potential than adult offenders. The defense argued that the fact that defendant

had "expressed remorse" and had a loving and supportive family was evidence of his rehabilitative potential. Accordingly, the defense requested a "merciful" sentence that would allow him to have "a second chance at life" and an opportunity to be "a contributing member to society."

¶ 23    After hearing the arguments, the court recessed to read the letters submitted on defendant's behalf and consider the arguments advanced in aggravation and mitigation. When the court returned, it sentenced defendant to 38 years' imprisonment. The court explained the rationale behind its sentencing decision as follows:

> "The court has now had an opportunity to consider the evidence at this trial, the presentence investigation report prepared by the Probation Department with its amendments and corrections, the information and evidence that has been offered by the parties both in aggravation and mitigation, specifically the victim impact statement of the family of Nathanial Gonzalez.
>
> The court has considered the information proffered by the Defense in mitigation, which includes the letters of the members of his family including his mother and grandmother, the people who have been involved in his life, and his elementary education and those involved with the Precious Blood Ministry who offered their thoughts in letters on behalf of [defendant].
>
> The court has considered the defendant's statement in his behalf. The court further considered the arguments of counsel as to the minimum and maximum range. The court looked to each of the factors in aggravation under the statute as well as the factors in mitigation by statute.
>
> Nathanial Gonzalez had the right to grow up and live a life free from the gun violence that took his life all too soon. His family had the right to have him in their lives to continue

as the family described him to be, a person who spread love and joy, who engaged in the lives of his younger siblings; but he was felled all too soon by gun violence, and gun violence against a child by another child, a child who is [defendant], who is before this court with many family members here in support of him, with a mother who is clearly devoted to her child from the beginning and clearly will be to the end.

The senselessness of all of the events that bring this situation before this court cannot be under scored.

The State has requested that this court sentence [defendant] as an adult. The State points to the critical factors in aggravation, those being the fact that this was a result of gang violence; that specifically the defendant—the act of taking of the live involved a lack of mercy, a lack of regard of human life. ***

In sentencing, the court really looks to the seriousness of the offense—and this couldn't be more serious—versus the need to restore a person, a defendant before this court, to useful citizenship. ***

The defendant today does acknowledge that his choices, his decisions resulted in him being here. But he also points to key factors in his upbringing: His background, being without a father in his life, and without certain resources.

The court, in determining what sentence to impose upon [defendant] considers all of these including the history and character and attitude that the defendant displays.

Now, clearly, based on his conduct since he has been incarcerated, he has managed to acquire two additional misdemeanor charges of public indecency. The court considers that the defendant, was in fact, a minor when he became incarcerated and all of the

circumstances surrounding that and what's brought him to this court and to the position and the state that he is in today.

The court, considering it all, has determined that despite the lack of mercy shown to Nathanial Gonzalez and the date that his life was taken senselessly, the court is electing not to impose the 20-year[3] [firearm] enhancement in consideration of his youth and the specific circumstances and evidence the court has heard about his youth.  However, the court in considering all of the factors and information and as well as considering the fact that the cost of confinement is now over $22,600 per year, the sentence that defendant will serve is 38 years in the Illinois Department of Corrections penitentiary.

For the benefit of the public, he will serve 100 percent of that imposed sentence for the [crime] of first degree murder."

¶ 24        This appeal followed.

¶ 25        II. ANALYSIS

¶ 26        On appeal, defendant argues that he is entitled to a new sentencing hearing because the circuit court "failed to consider the statutory mitigating factors applicable to juvenile offenders." Moreover, he characterizes his 38-year prison term as "excessive" and notes that it was "nearly double the 20-year minimum sentence" that he could have otherwise received.

¶ 27        The State, in turn, responds that the circuit court considered the relevant statutory juvenile mitigating sentencing factors and "acted within its discretion" when it sentenced defendant to 38 years' imprisonment.

---

[3] As will be explained below, the firearm enhancement at issue was a 25-year enhancement, not a 20-year enhancement.

¶ 28    As a threshold matter, defendant acknowledges that he failed to properly preserve his sentencing claims. Specifically, he did not object to the court's purported failure to consider the statutory mitigating factors at his sentencing hearing or in a postsentencing motion.[4] See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) (recognizing that "[i]t is well settled that, to preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required"). In an effort to avoid forfeiture, however, defendant invokes the plain error doctrine, which provides a limited exception to the forfeiture rule, and allows for review of forfeited sentencing issues on appeal if the evidence at the sentencing hearing was closely balanced or if the claimed error is of such a serious magnitude that it affected the integrity of the judicial process and deprived the defendant of his right to a fair sentencing hearing. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *Hillier*, 237 Ill. 2d at 545. Given that "[t]he right to be lawfully sentenced is a substantial right," sentencing claims may be reviewed for plain error. *People v. Whitney*, 297 Ill. App. 3d 965, 967 (1998). The first step in any plain error analysis is to determine whether any error actually occurred. *Hillier*, 237 Ill. 2d at 545. If an error is discovered, the defendant then bears the burden of persuasion to show that the error prejudiced him under either prong. *Id*. Keeping this standard in mind, we turn now to evaluate the merit of defendant's claim.

¶ 29    To withstand constitutional scrutiny, "criminal punishment should be graduated and proportioned both to the offender and the offense." *People v. Buffer*, 2019 IL 122327, ¶ 15; see also *People v. Lusby*, 2020 IL 124046, ¶ 32. Modern jurisprudence incorporating " 'evolving standards of decency,' " has recognized that juvenile offenders are, and should be, treated

---

[4] Although defendant did file a postsentencing motion, the motion did not reference the court's purported failure to consider the relevant mitigating factors. Moreover, the postsentencing motion that he did file was never ruled upon.

categorically different from adult offenders for purposes of sentencing. *Buffer*, 2019 IL 122327, ¶ 15 (quoting *Trop v. Dulles*, 365 U.S. 86, 101 (1958) (plurality opinion)); see also *People v. Holman*, 2017 IL 120655, ¶ 44 (recognizing that "age is not just chronological but a multifaceted set of attributes that carry constitutional significance" for purpose of sentencing).  Courts have explained that the disparity in treatment between adult and juvenile offenders is warranted due to the fact that "juveniles have diminished culpability and greater prospect for reform" than adult offenders and are thus " 'less deserving of the most severe punishments.' "  *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)).  In explaining the justification for treating juveniles and adults differently for purpose of sentencing, the United States Supreme Court has identified and emphasized "three significant gaps" that exist between juveniles and adults: "First, children have a ' "lack of maturity and underdeveloped sense of responsibility" ' leading to recklessness, impulsivity, and heedless risk-taking. [Citation] Second, children 'are more vulnerable…to negative influences and outside pressures,' including from family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings. [Citation.] And third, a child's character is not as 'well-formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " *Id*. at 473.

¶ 30     Given these differences, courts have repeatedly held that juvenile offenders are " 'less deserving of the most severe punishments.' " *Id*. at 471 (quoting *Graham*, 560 U.S. at 68).  For example, in *Roper v. Simmons*, 543 U.S. 541, 578-79 (2005) the United States Supreme Court held that the eighth amendment's prohibition against cruel and unusual punishment forbids the imposition of the death penalty on offenders who were under 18 years of age when they committed their crimes.  *Id*. at 578-79.  Thereafter, in *Graham*, 560 U.S. 48, the Court held that

the imposition of a life sentence without the possibility of parole on a juvenile offender who does not commit a murder, also violates the tenets of the eighth amendment. *Id*. at 82. Finally, in *Miller*, 567 U.S. 460, the Court concluded that any sentencing scheme calling for the mandatory imposition of a life sentence without the possibility of parole on offenders who were under the age of 18 at the time of their offense also violates the eighth amendment's prohibition against cruel and unusual punishment. *Id.* at 489. In doing so, the Court emphasized the importance of considering the "hallmark" mitigating characteristics of youth when sentencing juvenile offenders, including: the recognized "immaturity, impetuosity" of children and their "failure to appreciate risks and consequences;" the family and home environment of juveniles from which they are usually unable to extricate themselves; the extent of the juvenile offender's "participation in" the criminal conduct at issue and the manner in which "familial and peer pressures may have affected him;" the "inability" of juvenile offenders to meaningfully cooperate and coordinate with police officers and prosecutors and their "incapacity" to assist their attorneys in their own defenses; and juvenile defendants' unique prospects of rehabilitation. *Id*. at 477-78.

¶ 31    The Illinois Supreme Court has expanded upon the *Roper-Graham-Miller* trilogy of cases and has since held that courts must consider youth and its attendant characteristics prior to imposing discretionary life sentences (*Holman*, 2017 IL 120655, ¶ 46) or *de facto* life sentences, *i.e*. sentences greater than 40 years' imprisonment (*People v. Reyes*, 2016 IL 119271, ¶ 9; *Buffer*, 2019 IL 122327, ¶ 42) on juvenile offenders. Moreover, in 2016, the Illinois legislature enacted section 5-4.5-105 of the Unified Code of Corrections (Code), which sets forth a new sentencing scheme for all juvenile offenders and requires courts to consider the mitigating attendant characteristics of youth identified by the *Miller* court prior to imposing *any* sentence on a

juvenile offender. 730 ILCS 5/5-4.5-105 (West 2016); see also *Buffer*, 2019 IL 122327, ¶ 36 (recognizing that the list of mitigating factors set forth in section 5-4.5-105 of the Code is "taken from and consistent with *Miller*'s discussion of a juvenile defendant's youth and its attendant characteristics").

¶ 32    That provision provides in pertinent part, as follows:

"(a) On or after the effective date of this amendatory Act of the 99th General Assembly, when a person commits an offense and the person is under 18 years of age at the time of the commission of the offense, the court, at the sentencing hearing *** shall consider the following additional factors in mitigation in determining the appropriate sentence:

(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familiar pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of

remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider the lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105(a) (West 2016).

¶ 33     In addition to requiring courts to consider the aforementioned mitigating factors prior to sentencing a juvenile offender, the legislature further provided that the imposition of any firearm enhancement was left to the discretion of the circuit court and was no longer mandatory. Specifically, subsection (b) of the statute provides:

"(b) [T]he court may sentence the defendant to any disposition authorized for the class of the offense of which he or she was found guilty *** and may, in its discretion, decline to impose any otherwise applicable sentencing enhancement based upon firearm possession, possession with personal discharge, or possession with personal discharge that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person." 730 ILCS 5/5-4.5-105(b) (West 2016).

¶ 34     Although it has long been the rule that sentencing courts are not required to specifically articulate the basis for their sentencing decisions (*People v. Davis*, 93 Ill. 2d 155, 162-63 (1982); *People v. Brown*, 2018 IL App (1st) 160924, ¶ 17), courts reviewing the propriety of juvenile sentences have held that there must be some affirmative evidence in the record that the circuit court considered the applicable mitigating factors of youth prior to sentencing a juvenile defendant. See, *e.g., People v. Luna*, 2020 IL App (1st) 121216-B, ¶ 27 (holding that the mere fact that evidence pertaining to the *Miller* factors was admitted at a defendant's sentencing hearing and that the court heard arguments about those factors "does not necessarily mean that those factors were adequately considered"); *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 25 (holding that the circuit court's "one comment about the defendant's youth" was not sufficient evidence that the

court specifically considered the mitigating factors of the defendant's youth and its attendant circumstances); *People v. Peacock*, 2019 IL App (1st) 170308, ¶ 24 (holding that a "court's mere awareness of a defendant's age and consideration of a PSI does not provide evidence that the circuit court specifically considered defendant's youth and its attendant characteristics"); *People v. Harvey*, 2019 IL App (1st) 153581, ¶ 13 (same); *People v. Smolley*, 2018 IL App (3d) 150577, ¶ 22 (recognizing that although the circuit court stated that it considered statutory aggravating and mitigating factors prior to sentencing the juvenile defendant, the court never specifically mentioned the defendant's youth and its attendant characteristics, and as such, there was no evidence that the applicable mitigating factors were properly evaluated). To ascertain whether the circuit court properly considered the mitigating *Miller* factors, a reviewing court must examine the record as a whole, and determine whether the court made an "informed" sentencing decision based on its consideration of the "totality of the circumstances." *Lusby*, 2012 IL 124046, ¶ 35. No single factor is dispositive. *Id*. Where a court fails to properly consider the applicable mitigating factors of youth delineated in section 5-4.5-105 prior to sentencing a juvenile defendant, remand for a new sentencing hearing is warranted. See, *e.g., Peacock*, 2019 IL App (1st) 170308, ¶ 24; *Harvey*, 2019 IL App (1st) 153581, ¶ 14; *Smolley*, 2018 IL App (3d) 150577, ¶ 22.

¶ 35    Here, defendant submits that the record reflects that the court failed to specifically consider the mitigating hallmark characteristics of youth set forth in section 5-4.5-105 of the Code prior to sentencing him to 38 years' imprisonment. He emphasizes that the court never referenced the statute and failed to "go through" each of the mitigating factors delineated therein during his sentencing hearing.

¶ 36    Although there is no dispute that the circuit court never specifically referenced section 5-4.5-105 of the Code or conducted an itemized examination of the mitigating factors set forth in the

statute, the court did state that it had considered "the factors in aggravation under the statute as well as the factors in mitigation by statute." Defendant acknowledges the court's reference to the statutory mitigating factors but suggests that the court was referring to the statutory "adult mitigating factors;" however, it is clear that the court was aware of section 5-4.5-105 of the Code and the juvenile mitigating factors contained therein. It is likewise clear that the statute informed its sentencing decision. This is evidenced by the fact that the court exercised its discretion and elected not to impose the 25-year firearm sentencing enhancement that the State requested the court to impose. See 730 ILCS 5-4.5-105(b) (West 2016) (leaving it within the discretion of the sentencing court to decide whether to impose a firearm enhancement on a juvenile offender). Moreover, the record reflects that the court was keenly aware of, and carefully considered, defendant's status as a youthful offender. During the sentencing hearing, the court repeatedly referenced defendant's status as a "youth" and a "minor" and described the circumstances of the offense as "gun violence against a child by another child." In addition to considering defendant's status as a youthful offender, the court also considered the PSI, the letters submitted on defendant's behalf attesting to his good character and capacity for rehabilitation, the circumstances of the crime, and defendant's statement in allocution. Although the court did not conduct a comprehensive examination of each of the statute's mitigating factors on the record, the court did emphasize details that corresponded to several of those factors. Specifically, the court highlighted defendant's age (730 ILCS 5/5-4.5-105(a)(1) (West 2016)), his family and home environment, including the fact that he had grown up without a father (730 ILCS 5/5-4.5-105(a)(3) (West 2016)), his capacity for rehabilitation, including the fact that he had picked up two additional charges during his incarceration (730 ILCS 5/5-4.5-105(4) (West 2016)), the circumstances of the offense (730 ILCS 5/5-4.5-105(a)(5) (West 2016)), and defendant's statement in allocution in which he

expressed remorse for his actions (730 ILCS 5/5-4.5-105(a)(9) (West 2016)). Defendant is correct that the court did not specifically reference certain other mitigating factors, including his lack of criminal record prior to the shooting, the impetuousness of the crime, his lack of planning, and the fact that he was subjected to peer pressure and negative influences at the time of the offense; however, there is no dispute that the court was apprised of evidence pertaining to those factors both at trial and at the sentencing hearing. Although the better practice would undoubtably be for a court to examine each of the statute's mitigating factors on the record prior to sentencing a juvenile offender, the totality of the circumstances (*Lusby*, 2012 IL 124046, ¶ 35) do not support defendant's argument that the court failed to consider the attendant mitigating circumstances of his youth as codified in section 5-4.5-105 of the Code prior to imposing his sentence. Having found no error, there is no plain error. See *People v. Hood*, 2016 IL 118581, ¶ 18. Moreover, having found no error, we necessarily reject his alternative related claim that his attorney was ineffective for failing to raise this argument in the circuit court.

¶ 37    Defendant nonetheless suggests that he is entitled to a new sentencing hearing because his 38-year sentence is "excessive" as it fails to reflect his rehabilitative potential and the numerous mitigating factors applicable to his case.

¶ 38    It is well established that the sentence that the circuit court elects to impose after considering relevant aggravating and mitigating factors is entitled to great deference and will not be reversed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000); *People v. Lee*, 379 Ill. App. 3d 533, 539 (2008). When a sentence falls within the statutory guidelines, it is presumed to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense. *People v. Snyder*, 2011 IL 111382, ¶ 36; *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010).

¶ 39        Here, defendant was convicted of first degree murder, which carries a sentence of 20 to 60 years' imprisonment. See 730 ILCS 5/4.5-20(a) (West 2016) (the applicable sentencing range for the offense of first degree murder "not less than 20 years and not more than 60 years")[5]. Moreover, because the jury found that defendant personally discharged the firearm that resulted in Gonzalez's death, he was also eligible to receive a firearm enhancement that carried an additional 25-year to life penalty. See 730 ILCS 5/8-1(a)(1)(d)(iii) (West 2016) (providing that a 25-year to life firearm enhancement is applicable where a person personally discharged a firearm that resulting in the death of another person). As set forth above, the circuit court exercised its discretion and elected not to impose the enhancement in light of defendant's status as a youthful offender, and instead elected to sentence defendant to 38 years' imprisonment after considering the applicable statutory aggravating and mitigating factors. There is no dispute that defendant's 38-year sentence falls within the permissible statutory range, and it thus presumed proper. *Gutierrez*, 402 Ill. App. 3d at 900. Although the sentence is 18 years' more than the minimum sentence he could have otherwise received, his sentence does not amount to a *de facto* life sentence. See *Buffer*, 2019 IL 122327, ¶ 42 (a *de facto* life sentence is one that is more than 40 years' imprisonment). Ultimately, the record reflects that the court carefully considered the circumstances of the crime and applicable aggravating and mitigating factors prior to imposing defendant's sentence. Accordingly, we find that defendant has failed to rebut the presumption of propriety afforded to his sentence and has failed to establish that the circuit court abused its discretion and imposed an excessive sentence. Therefore, we affirm defendant's 38-year sentence.

---

[5] We note that the Illinois legislature recently enacted a provision allowing defendants, who were under 21 years old at the time that they committed first degree murder, to seek "parole review *** after serving 20 years or more" of their sentences. See Pub. Act 101-288 (eff. Jan. 1, 2020) (recodifying 730 ILCS 5/5-4.5-110 as 730 ILCS 5/5-4.5-115). This provision, however, only applies to defendants sentenced "on or after June 1, 2019." *Id.* Given that defendant was sentenced on January 24, 2018, he is unable to avail himself of the potential relief afforded by this provision.

¶ 40    III. CONCLUSION

¶ 41    The judgment of the circuit court is affirmed.

¶ 42    Affirmed.